**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jay Hilery DeWEESE,**
**Defendant–Appellant.**

**No. 79–5575.**

United States Court of Appeals,
Fifth Circuit.

Dec. 17, 1980.

Milton E. Grusmark, Miami, Fla., for defendant–appellant.

Stephen S. Cowen, Asst. U.S. Atty., Tampa, Fla., for plaintiff–appellee.

Before RONEY, HILL and FAY, Circuit Judges.

JAMES C. HILL, Circuit Judge:

At dawn on May 14, 1979 the "Cowboy," a large shrimping vessel, was stopped by a Coast Guard cutter in the Straits of Yucatan. Approximately 41,000 pounds of marijuana were discovered in the vessel's ice hold. This case is an appeal by the captain of the "Cowboy," Jay Hilery DeWeese, from a jury conviction for conspiracy to import marijuana into the United States. 21 U.S.C. §§ 952(a) and 963.

DeWeese's arguments fall into four categories. First, he contends that violations of the fourth amendment require that the marijuana be suppressed. Second, he argues that the district court lacks jurisdiction when the evidence fails to show that either the agreement to conspire or an overt act in furtherance thereof is commit-

ted in the United States. Third, he asserts that the evidence is insufficient to establish that he intended to import marijuana into the United States. Fourth, he maintains that the government violated Fed.R.Crim.P. 16 and the omnibus order in this case by failing to identify a witness, and provide a copy of the chart prepared by that witness, in a timely fashion. For the reasons set out below, we affirm.

### I. *Encounter in The Yucatan Straits*

On the morning of May 14, 1979 the Coast Guard cutter "Point Lobos" was on patrol near the Straits of Yucatan some 250 miles from the United States. It observed an unidentified vessel on its radar approximately nine miles away. Upon closer investigation the vessel was identified as a large shrimp boat with the name "Cowboy" and the home port of "Mobile" painted on her stern.

When first sighted, the "Cowboy" was on a heading of 290 to 300 degrees, or northwest, at nine knots per hour. As the "Point Lobos" closed to within three miles, the "Cowboy" changed course to a heading of 340 degrees, or north–northwest. At a distance of approximately twenty–five yards the "Point Lobos" requested over its loudspeaker that the "Cowboy" stop for a boarding.

Petty Officer Helms led a three man boarding party onto the "Cowboy." The appellant identified himself as the captain. Mr. Helms told him that he was checking the "Cowboy" for compliance with United States laws. Record, Vol. IV, at B–12–13.

In response to Mr. Helms request De-Weese produced documentation papers which identified the "Cowboy" as an American flagship. No permits were produced which would allow the "Cowboy" to shrimp in foreign waters. An inspection of the vessel revealed one minor safety violation and the absence of a required oil pollution placard.

During the inspection both Mr. Helms and Coast Guardsman Gayle observed that the vessel was extremely clean. The rigging for the shrimp nets appeared unused. In addition, the metal strips on the boards used for dragging the nets on the ocean floor were rusty. This suggested the boards had not been used recently as the metal strips would have been shiny from contact with the ocean floor.

After inspecting the "Cowboy's" engine room, Mr. Helms asked DeWeese if he could look in the vessel's ice hold where the catch is generally stored. DeWeese responded, "Sure, but you're not going to like what you find." (Record, Vol. IV, at B–17). De-Weese and another crewmember proceeded to lift the hatch to the ice hold. A large number of marijuana bales could be seen from the deck. DeWeese and his four crewmembers were placed under arrest. Five–hundred and three bales of marijuana weighing over 41,000 pounds with a value of approximately $8,000,000 were seized.

DeWeese and the four crewmembers were indicted for conspiracy with each other and others unknown for a twofold purpose: importation and possession with intent to distribute. The trial of the crewmembers was severed. The charge of conspiracy to possess with intent to distribute was struck from the indictment. DeWeese was convicted by a jury on the charge of conspiracy to import. He appeals.

### II. *Search and Seizure on the High Seas*

■ Appellant first argues that 14 U.S.C. § 89(a) is unconstitutional because it allows the Coast Guard to stop and board a vessel on the high seas without probable cause or reasonable suspicion. The fourth amendment prohibits only those searches and seizures that are unreasonable. This Circuit has found the Coast Guard's § 89(a) plenary authority to stop and board American vessels on the high seas to inspect for safety, documentation, and obvious customs and narcotics violations to be reasonable within the meaning of the fourth amendment. *United States v. Williams*, 617 F.2d 1063, 1075–78 (5th Cir. 1980) (en banc); *United States v. Erwin*, 602 F.2d 1183, 84 (5th Cir. 1979) (per curiam); *United States v. Warren*, 578 F.2d 1058, 1064–65 (5th Cir. 1978) (en banc). Such searches may be conducted "in the complete absence of suspicion of criminal activity." *Williams* at 1075.

Appellant's next contention leads us into less certain waters. Appellant asserts that even if we assume the Coast Guard correctly stopped and boarded the "Cowboy," Helms subsequent search of the ice hold was conducted without probable cause and is therefore violative of the fourth amendment.

Our inquiry properly begins with a determination of whether the disputed search has infringed an interest of the appellant which the fourth amendment was designed to protect. *Rakas v. Illinois*, 439 U.S. 128, 140, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978). Specifically, we must decide whether or not DeWeese has a "legitimate expectation of privacy" in the ice hold of a large shrimping vessel. *See Rawlings v. Kentucky*, —— U.S. ——, 100 S.Ct. 2256, 2261, 65 L.Ed.2d 633 (1980).

Our most recent en banc encounter with search and seizure at sea embraces this initial inquiry required by *Rakas*. *United States v. Williams*, 617 F.2d 1063 (5th Cir. 1980) (en banc). In *Williams* we held:

> We have concluded that "reasonable suspicion" is the appropriate fourth amendment standard by which to judge section 89(a) searches of the "private" areas–if there can be such areas–of the holds of vessels in international waters conducted for the purpose of discovering contraband or evidence of criminal activity.

617 F.2d at 1088.

In *Williams* we assumed that the defendant had a reasonable expectation of privacy in the hold, thereby avoiding the issue of what is necessary to constitute a privacy interest in the hold of a merchant vessel. *Id.*, at 1084–85. We cannot, and should not, avoid that issue here.

■ It has been established that the fourth amendment's protection is not to be measured exclusively by the laws defining property rights, trespass, and the like. *Rawlings v. Kentucky*, —— U.S. ——, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois*, 439 U.S., at 149–150, n.17, 99 S.Ct., at 434 n.17 (1978). One may have a protected expectation of privacy in the ab-

sence of property interest. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Rios v. United States*, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960). On the other hand, one may have fee simple title to property upon which he has no expectation of privacy. *Lewis v. United States*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966). *See Hester v. United States*, 265 U.S. 57, 59, 44 S.Ct. 445, 446, 68 L.Ed. 898 (1924). For example, the owner of a mercantile establishment gives up any legitimate expectation of privacy as to goods and wares in his glass enclosed shop window.

Upon and within enclosed real or other property, expectation of privacy may vary from area to area. The outer walls of a single family residence will usually be coextensive with privacy therein. In a condominium building, all legitimately inside the building have free access to the common areas; an owner's expectation of privacy, vis–a–vis others properly inside, would normally be limited to the owner's private living quarters.

Within a property where some of the enclosed area is private to the individual and the rest freely accessible, there may yet remain an expectation of privacy as to persons not entitled to be upon the property at all. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 314–15, 98 S.Ct. 1816, 1821–22, 56 L.Ed.2d 305 (1978). Nevertheless, in an area to which access is freely given to all properly and lawfully within the close, it is apparent that, as to them, a reasonable expectation of privacy does not exist in the common area. *Cf. United States v. Dionisio*, 410 U.S. 1, 13–16, 93 S.Ct. 764, 771, 35 L.Ed.2d 67 (1973) (the fourth amendment does not protect what "a person knowingly exposes to the public, even in his own home or office . . . .")

■ Of those legitimately aboard the "Cowboy" on the morning of May 14, 1979 was Petty Officer Helms. 14 U.S.C. § 89(a). *United States v. Williams*, 617 F.2d 1063, 1075–78 (5th Cir. 1980) (en banc); *United States v. Erwin*, 602 F.2d 1183, 1184

(5th Cir. 1979) (per curiam); *United States v. Warren*, 578 F.2d 1058, 1064–65 (5th Cir. 1978) (en banc). Though not pertinent to our task today, there may well have been enclosures to which Captain DeWeese and other individuals lawfully aboard retained a legitimate expectation of privacy. A crewman's foot locker, duffle bag, private cabin or quarters may well have been accessible to only that one individual and not others. The ice hold into which each would be expected to go (or, at least, to peer) was not such an area.[1] There can be no legitimate expectation of privacy in those areas of a commercial vessel which are subject to the common access of those legitimately aboard the vessel. *Cf. Coolidge v. New Hampshire*, 403 U.S. 443, 466–468, 91 S.Ct. 2022, 2038–2039, 29 L.Ed.2d 564 (1971).

### III. *Extraterritorial Jurisdiction and Sufficiency of the Evidence*

■ Appellant also alleges that the district court lacked jurisdiction over this case because there was no evidence to establish that either the agreement to conspire or an overt act in furtherance of the conspiracy was committed within the United States. This issue has been decided adversely to the appellant. *United States v. Ricardo*, 619 F.2d 1124 (5th Cir. 1980). As regards 21 U.S.C. § 963, *Ricardo* held that "[t]he fact that appellants intended the conspiracy to be consummated within the territorial boundaries satisfies jurisdictional requisites." *Id.*, at 1129. *See United States v. Perez–Herrera*, 610 F.2d 289 (5th Cir. 1980) (Congress intended the crime of attempting to import a controlled substance into the United States, 21 U.S.C. §§ 952(a) and 963,

to reach exclusively extra–territorial conduct.)

■ Appellant next attacks the verdict on the ground that the evidence was insufficient to establish that he intended to import the marijuana into the United States. In considering appellant's sufficiency of the evidence arguments we must view the evidence in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The test for sufficiency of the evidence is whether reasonable minds could conclude that the evidence is inconsistent with any reasonable hypothesis of the accused's innocence. *United States v. Henderson*, 588 F.2d 157 (5th Cir. 1979).

At trial only one witness addressed the issue of whether DeWeese intended to import the marijuana aboard the "Cowboy" into the United States. Commander Howard Gehring, who was qualified as an expert in navigation and oceanography, concluded that the "Cowboy" was "en route to a United States port." Record, Vol. IV, at B–142. Gehring's opinion was based on the assumption that a prudent mariner would take advantage of ocean currents, weather, bottom topography, and tides. *Id.*, at 111. The "Cowboy" had maintained two headings: 290 to 300 degrees, or northwest, and 340 degrees, or north–northwest. Gehring found that a vessel maintaining such headings in the Straits of Yucatan was positioned to take advantage of currents which would carry it north to the United States. The "Cowboy's" headings would not have favored a destination of Mexico, Cuba, or the Bahamas. *Id.*, at 130.

---

1. Two alternative grounds for upholding the district court's refusal to suppress the marijuana exist. First, we find that the Coast Guard had reasonable suspicion to search the hold for a narcotics violation. Based on their experience, the boarding party could have concluded that the location of the "Cowboy" coupled with the total absence of fishing activity created a "reasonable suspicion" that the "Cowboy" was on a narcotics run. Second, when Mr. Helms asked DeWeese if he could look in the ice hold DeWeese responded, "Sure, but you're not going to like what you find." Considering the circumstances as a whole we find that De-

Weese's response constitutes voluntary consent to search. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). However, these two grounds concern the "reasonableness" of the search. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) mandates that we begin our analysis with the inquiry of whether or not the search infringes on any interest of the defendant which the fourth amendment was designed to protect. As we have concluded that the search in question did not so infringe upon DeWeese, it is unnecessary to reach the "reasonableness" of the search.

Gehring also analyzed the navigational charts discovered aboard the "Cowboy." He concluded that only the charts for Mobile Bay, Alabama and the west coast of Florida, primarily Tampa Bay and Tarpon Springs, provided sufficient detail for a safe entry into port. It was noted that the only tidal tables on board the "Cowboy" were for Tarpon Springs. Gehring stated that the absence of detailed charts for Mexico, Cuba, the Bahamas, or anywhere outside of Mobile and west coast of Florida, would have prevented the "Cowboy" from safely entering foreign ports.

Based on Commander Gehring's testimony we find that a reasonable jury could have concluded beyond a reasonable doubt that the "Cowboy's" destination was an American port.

■ We also note that the evidence is sufficient to find that DeWeese was engaged in a conspiracy to import. *United States v. Alfrey*, 620 F.2d 551 (5th Cir. 1980). In *Alfrey* we concluded that the probable length of the voyage, the large quantity of marijuana on board, and the necessarily close relationship between the captain and his crew were factors from which the jury could reasonably find guilt beyond a reasonable doubt. *Id.,* at 556. See *United States v. Christian*, 505 F.2d 94, 96 (5th Cir. 1974). The comparable facts in the present case are no less compelling. We find particularly persuasive the government's argument that it is illogical to believe that one person would attempt to smuggle eight million dollars of marijuana from Colombia to the United States without pre-arranged assistance.

### IV. *Defendant's Discovery*

■ Appellant contends that two defects in the discovery process require reversal. On August 14, 1979, the day before trial, the government provided defense counsel with a chart prepared by Commander Gehring. The chart was a "visual display of Commander Gehring's explanation of his expert opinion." Appellee's Brief, at 27. Among other things, the chart depicted the ocean currents in the Gulf of Mexico.

"With minor modifications," the chart became Exhibit 27 and was used by Commander Gehring when he testified.

Appellant argues that this chart was a "report" within the meaning of Fed.R. Crim.P. 16(a)(1)(D). A month prior to trial on July 13, 1979 the defendant had requested all reports and examinations prepared by government experts. Appellant asserts that the government's failure to provide the report earlier constitutes a "flagrant" violation of his discovery request. He further urges that prejudice resulted because it was impossible to become familiar with the chart overnight without a background in oceanography.

The government responds that Commander Gehring's chart cannot properly be considered the report of a physical or mental examination or of a scientific test or experiment. Fed.R.Crim.P. 16(a)(1)(D). Our disposition of the issue does not require us to reach the government's contention. In the Fifth Circuit a failure to comply with Rule 16(a) is not reversible in the absence of a showing of prejudice. *United States v. Pascual*, 606 F.2d 561, 565 (5th Cir. 1979); *United States v. Arcentales*, 532 F.2d 1046, 1050 (5th Cir. 1976). The record in this case reveals no such prejudice. A broad assertion that DeWeese's counsel lacked adequate time for study of the chart does not constitute prejudice sufficient to require reversal.

■ Appellant next argues that the government violated the court's omnibus order. Under this order both parties were to exchange witness lists by July 20, 1979. On the day before trial, August 14, 1979, the government informed the appellant that Commander Gehring would be testifying. As a result, appellant complains that he was unable to properly prepare for the cross-examination of Commander Gehring. Appellant urges that there was no excuse for his not being informed about this crucial witness as the government "obviously knew of Commander Gehring's existence long before the day of trial." Appellant's Brief, at 37.

We can find no excuse for the government's failing to inform the appellant in a timely fashion that Caption Gehring would testify. Certainly his testimony is a crucial part of the government's case. We agree that it is inconceivable that the government learned of the Commander one day before trial.

To warrant reversal, however, the appellant must make a showing of prejudice. *United States v. Phillips*, 585 F.2d 745, 747 (5th Cir. 1978). He has failed to do so. Thus, although we strongly condemn the failure of the government to abide by its obligations under the omnibus proceeding, we cannot reverse appellant's conviction absent a showing of prejudice.

Finally, appellant argues that the "Cowboy" was depicted prejudicially on Commander Gehring's chart. We find this argument to be frivolous.

### V. *Conclusion*

In conclusion, we hold that the case was proved and the conviction is

AFFIRMED.