660 F.2d 1030
 UNITED STATES of America, Plaintiff-Appellee,
v.
Jack Wayne FREEMAN, Moses Taylor Millis, Keith Allen
Keesling, and Clifford Wayne Bennett, Defendants-Appellants.
 No. 80-5074.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit B*
 Nov. 12, 1981.
 Milton E. Grusmark, Miami, Fla., for defendants-appellants.
 Stephen L. Cowen, Asst. U. S. Atty., Tampa, Fla., for plaintiff-appellee.
 Appeals from the United States District Court for the Middle District of Florida.
 Before GODBOLD, Chief Judge, and TUTTLE and HILL, Circuit Judges.
 JAMES C. HILL, Circuit Judge:
 
 
 1
 A jury found beyond a reasonable doubt that appellants Jack Wayne Freeman, Moses Taylor Millis, Keith Allen Keesling, and Clifford Wayne Bennett engaged in a conspiracy to import approximately 41,000 pounds of marijuana into the United States 21 U.S.C. §§ 952(a) and 963. The appellants were crew members on the COWBOY, a large shrimping boat. The COWBOY's captain, Jay Hilery DeWeese, was separately tried and his conviction has been affirmed. United States v. DeWeese, 632 F.2d 1267 (5th Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 1967, 68 L.Ed.2d 290 (1981).
 
 
 2
 Appellants' arguments fall into essentially three categories. First, they argue that the Coast Guard's boarding and subsequent search of the vessel were conducted in violation of the fourth amendment. Second, they contend that the evidence was insufficient to convict them of importing marijuana into the United States. Third, they urge that harmful error occurred in the conduct of the trial. For the reasons set out below, we affirm the appellants' convictions.
 
 I. The Travels and Tale of the COWBOY
 
 3
 At dawn on May 14, 1979, the Coast Guard cutter POINT LOBOS observed an unidentified vessel on its radar, approximately nine miles away. The Commanding Officer of the POINT LOBOS proceeded to investigate the vessel, noting as he approached that the vessel was on a heading of 290 to 300 degrees, or northwest. When the POINT LOBOS was three miles away from the subject vessel, the vessel changed course, resulting in a heading of 340 degrees, or north-northwest. As the POINT LOBOS continued its approach, her commanding officer identified the subject vessel as a large shrimp boat and observed the name COWBOY and the home port "Mobile" painted on the stern of the vessel. He further observed that the COWBOY was not engaged in shrimping, as all of its fishing nets were on deck.
 
 
 4
 The POINT LOBOS closed to twenty-five yards and requested over the loudspeaker that the COWBOY stop for a boarding. A three-man party from the POINT LOBOS boarded the COWBOY. On board the COWBOY, Coast Guard Petty Officer Helms asked who was master and Jay Hilery DeWeese replied that he was captain. In response to Mr. Helms' request, DeWeese accompanied Mr. Helms to the pilot house and produced documentation papers showing that the COWBOY was a registered American vessel that cost $400,000 that had been launched in March, 1979, from Mobile, Alabama.
 
 
 5
 At the time of boarding, none of the COWBOY's shrimp nets were in the water. Mr. Helms also observed during inspection that the shrimping vessel was very clean. There were no shrimp nets attached to the COWBOY's extension booms. The boards used for dragging the shrimp nets were resting on deck. The metal strips covering the edges of the boards were rusty. This rust indicated that no shrimping had occurred because recent dragging on the sandy ocean floor would have polished the strips through a sandpaper effect. Based on what he observed concerning the COWBOY's shrimping gear, and based on his own experience with shrimping vessels, Mr. Helms concluded that the COWBOY had not been shrimping. When the COWBOY was taken back to port neither shrimp nor ice in quantities sufficient for shrimping was found.
 
 
 6
 After inspecting the COWBOY's documents and engine room, Mr. Helms asked DeWeese if he could take a look in the COWBOY's ice hold. Shrimp are usually stored in a shrimping vessel's ice hold. DeWeese responded, "Sure, but you're not going to like what you find." When DeWeese and appellant Keesling opened the hatch, Mr. Helms saw bales of what he believed to be marijuana and smelled the odor of marijuana. The appellants and DeWeese were then placed under arrest.
 
 
 7
 The ice hold contained 503 bales of marijuana weighing 41,750 pounds. The wholesale value of the marijuana was approximately $8,000,000.
 
 
 8
 DeWeese testified during the government's case-in-chief pursuant to a court order and a grant of use immunity. DeWeese claimed that around May 1, 1979, he was contacted by the owner of the COWBOY and asked if he wanted to take the COWBOY out again. DeWeese agreed and traveled in a friend's private plane from Marathon to Tampa, together with appellant Millis. DeWeese and Millis then proceeded to Tarpon Springs, docked, and they found appellants Keesling, Bennett, and Freeman already on board. Freeman was the cook. Millis had experience as a captain on other vessels and could assist DeWeese in navigating. Keesling had been on three or four previous trips aboard the COWBOY and acted as engineer. Bennett was the fourth member.
 
 
 9
 DeWeese gave the following explanation for the thousands of pounds of marijuana aboard the COWBOY. On May 14, 1979, the COWBOY headed toward the Dry Tortugas allegedly to go shrimping. However, during his early morning watch en route to Dry Tortugas, DeWeese claimed to receive an unexpected radio call from an unknown vessel calling itself the BOTIM. This anonymous caller asked DeWeese if he wanted to make some money. DeWeese replied affirmatively. The mysterious caller then instructed DeWeese to travel two hundred miles to the Rosario Banks. There, the voice said, the COWBOY would be loaded with marijuana. DeWeese expressed concern about the risks of the project to his unknown solicitor. The voice replied that the COWBOY would not be taking its cargo back to the United States; hence, the danger of capture would be minimized. DeWeese testified that later that day he told his crew they would be importing marijuana, not shrimping. He claimed to have quelled their fears by saying the vessel would not be entering American waters with the marijuana.
 
 
 10
 Two days later the COWBOY arrived at Rosario Banks. After anchoring, the unknown caller once again contacted DeWeese and, at long last, identified himself as Raynolds. Raynolds instructed DeWeese to proceed to Serrano Banks, some 200 miles away, off the coast of Nicarauga. Once again, DeWeese testified, the crew expressed concern and once again he quelled their fears by explaining that the COWBOY would not be entering American waters.
 
 
 11
 After arriving at Serrano Banks the COWBOY remained anchored for two days. After that period DeWeese was contacted by the BOTIM and Raynolds. A rendezvous was arranged. When the BOTIM arrived DeWeese and Raynolds met alone in the wheelhouse. According to DeWeese, Raynolds told him that he would get $150,000 after delivery of a load of marijuana to a point approximately 13-14 miles off the Mexican coast.
 
 
 12
 DeWeese testified that while the appellants watched, crew members from the BOTIM loaded the COWBOY with marijuana. After being loaded the COWBOY departed. It was subsequently stopped by the Coast Guard cutter POINT LOBOS in the Straits of Yucatan.
 
 
 13
 DeWeese also testified that he was an experienced navigator. He claimed that he had never smuggled before. Government counsel confronted DeWeese with a navigational chart found aboard the COWBOY. The chart was devoted solely to the Isle de Providencia, a small island off Nicaragua and near Serrano Banks. DeWeese, however, continued to deny that he had planned in advance to travel to that area.
 
 
 14
 DeWeese insisted that he never discussed with appellants how they would be paid for their ten days at sea. But he did acknowledge that crew members on a shrimping trip usually are paid based on a share of the catch. DeWeese also testified that throughout the trip he slept four to six hours a day and that each appellant took his regular four hour watch. DeWeese also claimed that none of the appellants ever refused an order from DeWeese.
 
 
 15
 DeWeese's testimony was reputed in part by two government experts. Travis Kuykendall, Staff Coordinator for the Mexican and Central American Division of Enforcement for DEA, with six years experience as a DEA agent in Mexico, was qualified as an expert on the drug movement, trends, and economics of drug trafficking in Mexico and Central America. Kuykendall testified that the Isle de Providencia, the island for which the COWBOY carried a detailed navigational chart, is a well-known staging point and resupply area for ships leaving South America with narcotics.
 
 
 16
 Kuykendall also testified that marijuana is not smuggled into Mexico since Mexico is an exporter of marijuana, supplying the United States with 25-30% of its marijuana. The street value of Mexican marijuana actually sold in Mexico is $50 per pound compared to a street value of $150 to $200 per pound in the States. And Colombian marijuana has a street value of at least $350 per pound in the States.
 
 
 17
 Kuykendall further testified that the point some 13-14 miles off Mexico's coast which DeWeese claimed to be his destination is actually a major marijuana producing area. Finally, Kuykendall also testified that in his years of experience in monitoring drug traffic he had never heard of Colombian marijuana being smuggled into Mexico.
 
 
 18
 Commander Howard Gehring of the Coast Guard testified as an expert witness in oceanography and navigation. He based his opinion on the assumption that a prudent mariner on the high seas in a vessel the size of the COWBOY would make use of navigational charts, ocean currents, the weather, and tides in reaching a destination. Based on an analysis of these factors Gehring concluded that at the time of its seizure the COWBOY's heading indicated that its destination was the United States not Mexico. Furthermore, Gehring's analysis showed that the charts aboard the COWBOY would not allow it safely to enter any ports other than Mobile Bay and several west Florida ports. Finally, the only tidal tables which the COWBOY had on board were two handwritten tables for Tarpon Springs, Florida, one of which showed the times and heights of tides in that port for May, 1979.
 
 
 19
 The record does not show whether the government anticipated the substance of DeWeese's testimony or whether it was sandbagged. In either event, the jury obviously rejected the thrust of DeWeese's tale for they found the appellants guilty.
 
 II. The Seizure and Search of the COWBOY
 
 20
 First, appellants argue that the Coast Guard's boarding and search of the COWBOY pursuant to 14 U.S.C. § 89(a) is unconstitutional in the absence of reasonable suspicion or probable cause that a narcotics violation has occurred. We have held on numerous occasions that the Coast Guard's plenary authority under § 89 "to stop and board American vessels on the high seas to inspect for safety, documentation, and obvious customs and narcotics violations to be reasonable within the meaning of the fourth amendment." United States v. DeWeese, 632 F.2d 1267, 1269 (5th Cir. 1980); United States v. Jonas, 639 F.2d 200, 202 (5th Cir. 1981) (emphasis added). These inspections may be conducted "in the complete absence of suspicion of criminal activity." United States v. DeWeese, 632 F.2d at 1269; United States v. Williams, 617 F.2d 1063, 1075 (5th Cir. 1980) (en banc).
 
 
 21
 Second, appellants argue that Mr. Helms' subsequent search of the ice hold was conducted without probable cause or reasonable suspicion and is therefore violative of the fourth amendment. This issue has already been decided adversely to appellants. We have held on several occasions that neither captain nor crew has a legitimate expectation of privacy protected by the fourth amendment in an area which is subject to the common access of those legitimately aboard the vessel. The ice hold or fish hold, where the Coast Guard has statutory and regulatory authority to search, is such an area. United States v. Willis, 639 F.2d 1335, 1337 (5th Cir. 1981); United States v. DeWeese, 632 F.2d 1267, 1270-71 (5th Cir. 1980). Hence, the district court properly refused to grant the appellants' suppression motion.
 
 
 22
 III. Jurisdiction and Sufficiency of the Evidence
 
 A. Jurisdiction
 
 23
 Appellants argue that the district court lacked jurisdiction over this case because there was no evidence to establish that either the agreement to conspire or an overt act in furtherance of the conspiracy was committed within the United States. In the context of 21 U.S.C. § 963, we have previously held that "(t)he fact that appellants intended the conspiracy to be consummated within territorial boundaries satisfies jurisdictional requisites." United States v. DeWeese, 632 F.2d 1267, 1271, quoting United States v. Ricardo, 619 F.2d 1124, 1129 (5th Cir. 1980). See United States v. Perez-Herrera, 610 F.2d 289 (5th Cir. 1980) (Congress intended the crime of attempting to import a controlled substance into the United States, 21 U.S.C. §§ 952(a) and 963, to reach exclusively extra-territorial conduct.).
 
 B. Destination of the COWBOY
 
 24
 Appellants assert that the evidence was insufficient to establish that they intended to import marijuana into the United States. The standard of review in a criminal case when the issue is sufficiency of the evidence is whether a reasonable minded jury must necessarily entertain a reasonable doubt as to the defendant's guilt under the evidence. United States v. Slone, 601 F.2d 800, 802 (5th Cir. 1979). In evaluating a claim of insufficient evidence according to this standard, we must consider the evidence in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), resolving reasonable inferences and credibility choices in support of the jury's verdict, United States v. Henderson, 588 F.2d 157, 161 (5th Cir. 1979).
 
 
 25
 Specifically, appellants argue that DeWeese's testimony that the COWBOY's destination was a point 13-14 miles off the coast of Mexico was not refuted beyond a reasonable doubt by the government's evidence. We disagree.
 
 
 26
 The government presented two witnesses to show that the COWBOY's destination was the United States. First, Travis Kuykendall, Staff Coordinator for the Mexican and Central American Division of Enforcement for the DEA, testified that in his experience he had never heard of Colombian marijuana being imported into Mexico. Agent Kuykendall supported his conclusion by a discussion of the economics of marijuana. He explained that a pound of Mexican marijuana sells for $50 in Mexico and $150 in the United States and that Mexico annually exports 2000 to 3000 tons of marijuana to the States. Furthermore, he testified that Colombian marijuana sells for $350 a pound in the United States. Based on the above factors, Kuykendall concluded that there is no market for Colombian marijuana in Mexico.
 
 
 27
 Second, Commander Howard Gehring of the Coast Guard, who was qualified as an expert in navigation and oceanography, concluded that the COWBOY was en route to a United States port. Gehring's opinion was based on the assumption that a prudent mariner would take advantage of ocean currents, weather, bottom topography, and tides. The COWBOY had maintained two headings: 290 to 300 degrees, or northwest, and 340 degrees, or north-northwest. Gehring found that a vessel maintaining such headings in the Straits of Yucatan was positioned to take advantage of currents which would carry it north to the United States. The COWBOY's headings would not have favored a destination of Mexico, Cuba, or the Bahamas.
 
 
 28
 Gehring also analyzed the navigational charts discovered aboard the COWBOY. He concluded that only the charts for Mobile Bay, Alabama and the west coast of Florida, primarily Tampa Bay and Tarpon Springs, provided sufficient detail for a safe entry into port. It was noted that the only tidal tables on board the COWBOY were for Tarpon Springs. Gehring stated that the absence of detailed charts for Mexico, Cuba, the Bahamas, or anywhere outside of Mobile and west coast of Florida, would have prevented the COWBOY from safely entering foreign ports.
 
 
 29
 Based on the testimony of Agent Kuykendall and Commander Gehring, a reasonable jury could have rejected DeWeese's testimony and concluded beyond a reasonable doubt that the COWBOY's destination was an American port.
 
 C. Evidence of Conspiracy
 
 30
 In United States v. DeWeese, 632 F.2d 1267 (5th Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 1967, 68 L.Ed.2d 290 (1981), we relied explicitly on United States v. Alfrey, 620 F.2d 551 (5th Cir. 1980), in holding that
 
 
 31
 ... the probable length of the voyage, the large quantity of marijuana on board, and the necessarily close relationship between the captain and his crew were factors from which the jury could reasonably find guilt beyond a reasonable doubt.
 
 
 32
 Id. at 1273; see United States v. Alfrey, 620 F.2d 551, 556 (5th Cir. 1980).
 
 
 33
 Here we have (1) the same lengthy voyage (10 days); (2) the same large quantity of marijuana (41,000 pounds); and (3) the same close relationship between captain and crew inferable from the length of the voyage and the size of the vessel. Furthermore, the jury was entitled to consider DeWeese's inculpatory statements about the crew even though they rejected his exculpatory statements on their behalf. Based on DeWeese's testimony, the jury knew that there was, in fact, a close relationship between captain and crew. Furthermore, DeWeese made clear that the four appellants were well aware of the presence of marijuana aboard the COWBOY. In sum, the three Alfrey-DeWeese factors alone would be sufficient to establish a prima facie case of conspiracy to import.[1] Here, the inferences to be drawn from those factors were buttressed by DeWeese's testimony.
 
 
 34
 Appellants contend that mere presence and association is insufficient to convict them of conspiracy. The simple response to this argument is that a ten day voyage on a vessel that was bulging with 41,000 pounds of marijuana constitutes much more than "mere presence" or "mere association" as those terms have been used by this court. See United States v. Alvarez, 625 F.2d 1196 (5th Cir. 1980) (en banc). We can do no better than to repeat the analysis in United States v. Alfrey, 620 F.2d 551 (5th Cir. 1980):
 
 
 35
 Appellant Haight relies on decisions of this court holding that mere presence in an area where drugs are discovered is insufficient evidence to support a conviction for possession. United States v. Rojas, 537 F.2d 216 (5th Cir. 1976), cert. denied, 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777; United States v. Ferg, 504 F.2d 914 (5th Cir. 1974). These cases do not aid appellants because more than mere presence has been established in the instant case. In United States v. Ferg, supra, we held that evidence that the accused was a passenger in an automobile which had marijuana hidden in it was insufficient to support a criminal conviction. Clearly a member of a three man crew on a long ocean voyage in a small vessel packed with tons of marijuana is different from the passenger in Ferg or the person whose fingerprints were found on envelopes containing drugs in United States v. Stephenson, 474 F.2d 1353 (5th Cir. 1978), or the person found crouched by a rock near a house containing marijuana in United States v. Lopez-Ortiz, 492 F.2d 109 (5th Cir. 1974). In this case the probable length of the voyage, inferable from the proximity of the border and the documentary evidence, the large quantity of marijuana on board, which made it indisputable that Alfrey and Haight had knowledge of the marijuana, and the necessarily close relationship between the captain of the trawler and his two man crew were factors from which the jury could reasonably find guilt beyond a reasonable doubt.
 
 
 36
 Id. at 556.
 
 IV. Appellant's Remaining Arguments
 
 37
 Appellants argue that the prosecutor impermissibly commented on the appellants' failure to testify thereby violating their fifth amendment right against self incrimination. This contention is based on the following closing arguments.
 
 Defense counsel argued:
 
 38
 Evidence as opposed to theory. Mr. Cowen's basic theory is that because the defendants didn't conspire to mutiny, that they are guilty. They are not charged with failing to conspire to mutiny.
 
 
 39
 Now, you do not know, nor does Mr. Cowen whether Jack Freeman is capable of overcoming Hilery DeWeese I know I couldn't.
 
 
 40
 You do not know whether Moses Millis or Cliff Bennett or Keith Keesling is capable of overcoming Hilery DeWeese. There is certainly no requirement in the law that they sit and conspire to do that.
 
 
 41
 You do not know whether the four of them together could conspire to overcome the unknown people who loaded the vessel. And nobody says that didn't take place.
 
 
 42
 Did they have to get together to overcome eight unknown South Americans? Or whatever?
 
 
 43
 Did they know how many other men would be there to pick it up?
 
 
 44
 Jack Freeman said and the only sentence out of his mouth in this case as related by DeWeese, is, "I want to get home to my wife and kids." And I'm sure he meant, "I want to get home to my wife and kids alive."
 
 
 45
 Now, I have no idea what I would do, faced with that situation. I might want to be a hero and attack DeWeese who at one point locked himself in with a voice on the radio.
 
 
 46
 I might want to be more concerned about reaching the safety of the Coast Guard and getting home alive to see my wife and kids.
 
 
 47
 I don't know what I would do. But that's not the charge in the case. That's a smoke screen. That's an absolute smoke screen, because there's not one word in the indictment that says they are charged with not conspiring to commit mutiny.
 
 
 48
 Make Mr. Cowen when he stands up again, so that you get an answer because he going to stand up again, and I can't answer him. The jury must do it in the jury room make him show you in the indictment one word that charges them with failure to mutiny. There isn't any.
 
 In rebuttal the prosecution argued:
 
 49
 I suggest to you, ladies and gentlemen, that there is sufficient evidence in this case for you to determine that these defendants participated with Mr. DeWeese in a conspiracy to bring marijuana into the United States. They didn't make it because the Coast Guard caught them. But that was a conspiracy. And some may have been followers and some may have been leaders, but there is no defense of coercion in this case. You haven't heard any evidence of coercion. No one held a gun to anyone's head
 
 
 50
 MR. GRUSMARK: Object Your Honor. Fifth Amendment.
 
 
 51
 THE COURT: Well, I'll overrule that objection. It seems to me its responsive.
 
 
 52
 Go ahead, Mr. Cowen.
 
 
 53
 MR. COWEN: (Continuing) There's a lot of money to be made smuggling marihuana. These crewmembers wanted to take advantage of that, as did Mr. DeWeese. And the only reason they are sitting here today is, they were caught.
 
 
 54
 Ladies and gentlemen. I submit to you that based on the evidence before you these men are guilty as charged.
 
 
 55
 Thank you.
 
 
 56
 The prosecutor's comments are a comment on the failure to establish a coercion theory. As such, it is proper rebuttal. See United States v. Becker, 569 F.2d 951, 965 (5th Cir. 1978); United States v. Dearden, 546 F.2d 622, 625 (5th Cir. 1977).
 
 
 57
 Appellants also contend that the government's proof amended the indictment and thus violated the appellants' fifth amendment right to be indicted only by a grand jury. Specifically, the appellants argue that the conspiracy charged in the indictment was limited to the Yucatan Straits whereas the appellants intended to import marijuana into either Marathon or Tarpon Springs, Florida. A simple, straightforward reading of the indictment refutes appellants' argument; hence, we discuss it no further. The appellants' remaining arguments are without merit.
 
 V. Conclusion
 
 58
 In sum, we hold that the cases were proved and the convictions are
 
 
 59
 AFFIRMED.
 
 GODBOLD, Chief Judge, specially concurring:
 
 60
 I concur in the result but only because I am bound by unfortunate language in U. S. v. DeWeese, 632 F.2d 1267 (5th Cir. 1980), that is the basis for the decision in this case. DeWeese was handed down a month and a half after this case was argued. It states, relying on U. S. v. Alfrey, 620 F.2d 551 (5th Cir. 1980), that if a vessel is caught with marijuana aboard the presence of three factors will make out a prima facie case of conspiracy between captain and crewmen to import: a long voyage, a large quantity of marijuana on the vessel, and a "necessarily close relationship" between captain and crew members.
 
 
 61
 The DeWeese language sweeps too broadly. The third factor, the close relationship between captain and crew, will always be present because captain and crew are necessarily thrown together by arrangements for eating and sleeping and for working a small vessel. Until DeWeese is corrected every officer and every crewman on every fishing and shrimping boat that makes a "long voyage" (here ten days) in the Gulf or Atlantic is now prima facie a conspirator if a large quantity of contraband is found aboard the vessel. The same will be true of all officers and crew on recreation and pleasure craft.
 
 
 62
 DeWeese should be overruled. Alfrey should be overruled or clarified so that no other panel will put on it the construction suggested by the majority in this case.
 
 
 63
 DeWeese is wrong because, first, it is inconsistent with our prior jurisprudence concerning the sufficiency of evidence permitting an inference that a defendant has joined in a conspiracy that is going on in his presence and of which he has knowledge. Second, it misreads Alfrey.
 
 
 64
 Turning first to our prior jurisprudence, under familiar standards we review the evidence in the light most favorable to the government, together with the reasonable inferences that may be drawn therefrom. When the evidence of the defendants' knowing participation in the conspiracy is circumstantial we must decide "whether the jury could reasonably, logically, and legally infer from the evidence presented that (defendants were) guilty beyond a reasonable doubt" (citations omitted), or, put another way, "could the jury reasonably find that the evidence was inconsistent with every hypothesis of innocence?" U. S. v. Littrell, 574 F.2d 828, 832 (5th Cir. 1978).
 
 
 65
 In drug conspiracy cases under 21 U.S.C. § 963 it is not necessary that an overt act be charged or proved but only that the defendant knowingly participated in the conspiracy. E. g., Littrell, at 832. "(M)ere presence, association, acquiescence, or approval without more is not sufficient to establish that a defendant is a member of a conspiracy." U. S. v. Macker, 608 F.2d 223, 227 (5th Cir. 1979). "(T)here must be proof beyond a reasonable doubt that a conspiracy existed, that the accused knew it and, with that knowledge, voluntarily joined it." U. S. v. White, 569 F.2d 263, 267 (5th Cir.), cert. denied, 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149 (1978). "Proof of an agreement to enter into a conspiracy is not to be lightly inferred." White, 569 F.2d at 267. We have now rejected the rule we formerly followed that once there is evidence establishing the existence of a conspiracy only slight evidence is necessary to connect a defendant with it, and we now follow the rule that there must be substantial evidence of that connection. U. S. v. Malatesta, 590 F.2d 1379 (5th Cir.) (en banc), cert. denied, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979).
 
 
 66
 The DeWeese formulation is, of course, correctly directed toward whether there is evidence from which it can be inferred that an officer or crew member had knowledge of a conspiracy in progress on the vessel. But knowledge is not participation in the conspiracy. Without more, the three factors are not sufficient basis to permit an inference that persons on the vessel have joined in the conspiracy as participants. In this case the jury could, of course, infer that a conspiracy existed involving DeWeese, the radio spokesman, and the persons who unloaded the delivery vessel and loaded the Cowboy. But there is not sufficient evidence that any member of the Cowboy's crew joined in this conspiracy. I have attached as Appendix A a description of DeWeese's testimony in this case. He was the key witness for the government, and he testified during the case in chief. The defendants did not testify. No witness other than DeWeese gave testimony tending to show participation by the defendants in a conspiracy other than testimony describing the presence of the defendants on the Cowboy and the fact that none of them asserted innocence when the Coast Guard boarded.
 
 
 67
 In numerous vessel cases the courts have relied upon several kinds of evidence that, when added to the DeWeese factors, carry presence and knowledge over the line to joining in the conspiracy:
 
 
 68
 Evidence tending to show that before the voyage the defendants had agreements or conversation about going on a marijuana venture or had been on such a voyage before.
 
 
 69
 Evidence that after the voyage began there were negotiations or agreements between defendant and co-conspirators concerning joining in the venture.
 
 
 70
 Evidence that the vessel had as its known destination a usual source of marijuana.
 
 
 71
 Evidence that a defendant received, or made a bargain for, drug transaction money.
 
 
 72
 Evidence that a defendant helped to load the marijuana, to handle it once it was aboard the vessel, to clean up after loading, or to participate in unloading.
 
 
 73
 Lack of fishing or shrimping gear.
 
 
 74
 Maps and charts on which incriminating marks appeared.[1]
 
 
 75
 Evidence that a defendant either set or selected a course for the vessel.
 
 
 76
 Evidence that a defendant participated in evasive action, flight, throwing of marijuana overboard, or the like.
 
 
 77
 Evidence that the vessel went into a port or mooring at which the defendant might have jumped ship.
 
 
 78
 DeWeese, and now this case, make such additional evidence unnecessary.
 
 
 79
 Second, DeWeese misreads our decision in Alfrey. Defendants Alfrey and Haight were crewmembers aboard a 70 foot trawler entering Tampa Bay and loaded with marijuana. During night hours the trawler engaged in a suspicious series of maneuvers and events involving two smaller boats, one of which was operating without lights and with its windshield covered. In reviewing sufficiency of the evidence we held:
 
 
 80
 The jury could have reasonably concluded that appellants Alfrey and Haight sailed as crew members from Colombia, South America to their point of capture within Tampa Bay in a vessel laden with over 19,000 pounds of marijuana. That conclusion and the highly suspicious events of the night of the capture could logically lead the jury to conclude that Alfrey and Haight imported marijuana into the United States, possessed marijuana with intent to distribute it and conspired to commit these two substantive offenses.
 
 620 F.2d at 555. Also we held:
 
 81
 In this case the probable length of the voyage, inferable from the proximity of the border and the documentary evidence, the large quantity of marijuana on board, which made it undisputable that Alfrey and Haight had knowledge of the marijuana, and the necessarily close relationship between the captain of the trawler and his two man crew were factors from which the jury could reasonably find guilt beyond a reasonable doubt. See United States v. Christian, 505 F.2d 94, 96 (5th Cir. 1974), finding such inference from a similar fact situation.
 
 
 82
 Id. at 556. Reading together the language quoted above from p. 555 and that from p. 556, it appears that the court held that the evidence permitted an inference that the conspiracy was operative in Colombia when the boat sailed from Colombia with defendants and marijuana aboard. The "three factors" discussed at 620 F.2d 556 are necessarily limited by the "beginning of the conspiracy" facts discussed at p. 555. Moreover, the Alfrey court appeared to be of the view that Alfrey and Haight were participants in the highly suspicious events that occurred on the night of capture. DeWeese disregarded these additional factors and only relied upon the three-factor language appearing at p. 556.
 
 
 83
 The evidence does not permit the jury to draw the inferences that Alfrey, at p. 555, held could be drawn in that case. For example, it does not support an inference that crewmembers of the Cowboy were participating in a conspiracy when the vessel departed Tarpon Springs. The jury could not infer that the crew even knew of a conspiracy at that time or even knew where the vessel was bound. All that the evidence showed as of the place and time of embarkation was that seamen, some of whom knew each other and knew the captain and some of whom had been on one previous voyage together with the captain, left port in a shrimp boat rigged for shrimping and commanded by Captain DeWeese. The facts necessarily relied upon to permit an inference that the crew joined a conspiracy at a later time and place were facts about subsequent events length of voyage, quantity of marijuana, and close association with the captain.
 
 
 84
 In n.1, as an alternative ground of decision, Judge Hill attempts to find factors in the present case that are analogous to those mentioned in Alfrey at p. 555. But his primary ground of decision is that the "three-factor test" drawn by DeWeese from p. 556 of Alfrey is enough.
 
 
 85
 Of course, as noted by Judge Hill, the jury could accept DeWeese's inculpatory testimony and reject his exculpatory testimony. The issue is whether the inculpatory testimony is sufficient to escape a motion for judgment of acquittal. But for the unfortunate language in DeWeese the inculpatory evidence would not be sufficient.
 
 
 86
 DeWeese had not been decided when this case was briefed and argued. It is not without significance that in brief and oral argument the government did not contend for the grudging reading of Alfrey that this court, a month and a half later, gave in DeWeese. Rather the government contended that the evidence was pushed over the line of sufficiency by the crew's usual performance of duty and their failure to mutiny, take to the lifeboats, or radio the Coast Guard. Thus, the evidence that the government urged made it possible for the case to be submitted to the jury was later held by this court to be not even necessary.
 
 APPENDIX A
 
 87
 DeWeese is a resident of Marathon, Florida, in the Florida Keys, as are the four defendants. He is an experienced commercial fisherman and owns a commercial lobster and crab fishing boat. He had been shrimping 10 to 12 times, sometimes as captain and other times as crew. In March 1979 he served as captain of the Cowboy, a new 88-foot vessel, on a shrimping voyage on which the crew consisted of his son and defendants Millis, Keesling and Bennett. Before this March voyage DeWeese knew Millis and Bennett on sight. This voyage was discontinued when the Cowboy's radio transmission equipment failed. Between March and May 1979 the Cowboy made three or four shrimping voyages on which Keesling, Bennett and Freeman served as crew but with a different captain or captains.
 
 
 88
 Around May 1979 DeWeese was contacted by the owner of the Cowboy, who had arranged for him to take the vessel out in March, and asked if he wanted to take the boat out again. DeWeese agreed. DeWeese asked Millis, who had been on the March voyage, to be a member of the crew. The two of them flew together from Marathon to Tampa in the private airplane of a friend with whom they were able to get a ride. DeWeese and Millis went to Tarpon Springs, north of Tampa, where the Cowboy was docked. When they arrived the boat was already fueled and filled with ice and had aboard most of the groceries necessary for a two-week trip. Defendants Keesling, Bennett and Freeman were already on board from the Cowboy's last voyage (some may have been temporarily off getting groceries), and their belongings were on board.
 
 
 89
 It was agreed that Freeman would be the cook. Millis had served as captain on other vessels and could assist in navigating. Keesling was to act as engineer. The Cowboy was equipped with shrimp nets and with baskets for handling shrimp.
 
 
 90
 The Cowboy left Tarpon Springs on May 4 and headed toward the Dry Tortugas to go shrimping. On route to the Tortugas while standing the 4:00 a.m. to 8:00 a.m. watch, around 4:30-5:00 a.m., DeWeese was playing with the radio and received a call from another vessel that he had not heard of before, calling the Cowboy by name. After several calls he answered. The caller identified himself by name and asked if DeWeese was interested in making money, more than he could make shrimping. After thinking the matter over for a while DeWeese received a second call and replied affirmatively. He was instructed to travel 200 miles to the Rosario Banks, approximately 140 miles due west of the Cayman Islands, and there the Cowboy would be loaded with marijuana. DeWeese told the caller he was afraid to do this, and the caller replied that there was no danger because the Cowboy would not be going back to the United States with the cargo. Later DeWeese informed the caller by radio that the Cowboy was proceeding to the Rosario Banks.
 
 
 91
 The vessel headed for the Rosario Banks. About noon that day Freeman asked where they were going, and DeWeese told him they were not going shrimping but to get a load of marijuana. Freeman passed the word to other crewmembers and later in the day DeWeese talked to all of them. Millis and Freeman came to the wheelhouse and expressed concern, and DeWeese told them "that's where I was taking the boat." They "were worried about the fact where the boat was going." DeWeese told them that they would not be going into American waters. Bennett and Keesling also expressed their concern.
 
 
 92
 It took two days to reach the Rosario Banks. During that time each crewmember took his watches. Freeman cooked and Keesling gave the engine such attention as it needed. After the vessel anchored at the Rosario Banks the same voice as before called on the radio and talked to DeWeese, who was alone on the bridge. DeWeese could not say whether the radio was loud enough for the crewmembers to overhear. The voice instructed DeWeese to travel to the Serrano Banks, some 200 miles away and off the coast of Nicaragua. DeWeese informed the crewmembers of this. Again they expressed concern. Freeman said "I've got a wife and children," and expressed concern that they might be stopped. DeWeese again explained that the boat would not be coming to the United States. Freeman was still concerned and said he did not think it was a good idea. Millis was "about the same mind" as Freeman. Freeman and Millis did most of the talking.
 
 
 93
 The vessel proceeded to the Serrano Banks and anchored for two days. A radio message was received that a vessel would rendezvous with it. When the other vessel arrived DeWeese and Millis threw a line to it and tied the two vessels together. A man boarded the Cowboy from the other vessel and identified himself as the radio spokesman. He and DeWeese met alone in the wheelhouse of the Cowboy. They negotiated an arrangement under which DeWeese would be paid $150,000 to deliver the load of marijuana to a point approximately 13 to 14 miles off the coast of Mexico. DeWeese was instructed how to signal to two boats that would meet him and unload the marijuana.
 
 
 94
 Eight crewmembers from the other vessel loaded the Cowboy with bales of marijuana. They brought it aboard, put it in the hold, and stacked it. The defendants watched the loading operation. None of them handled the marijuana in any fashion. None cleaned up any debris left from the loading. DeWeese received no money. When loading was complete DeWeese and Millis covered the hatches with plastic bags. The Cowboy weighed anchor, departed, and entered the straits of Yucatan.
 
 
 95
 Throughout the voyage crewmembers brought up how they would be paid since they were not shrimping, but DeWeese refused to discuss money with them. DeWeese explained his command of and control over the crew as follows:
 
 
 96
 Q Were they refusing any directions that you were giving them?
 
 
 97
 A Not refusing, no.
 
 
 98
 Q So when you told somebody to lay anchor, they would do that?
 
 
 99
 A Yes, sir.
 
 
 100
 Q Weigh anchor?
 
 
 101
 A Yes, sir.
 
 
 102
 Q When you told somebody to stand watch, they would stand watch?
 
 
 103
 A Yes, sir.
 
 
 104
 Q Nobody said, "No, I don't want anything to do with this?"
 
 
 105
 A They better damn well have not said that.
 
 
 106
 Q Well, what would you have done, Mr. DeWeese? With no gun?
 
 
 107
 (Objection made and overruled.)
 
 
 108
 A I would have ordered the man to his sleeping quarters to stay there.
 
 
 109
 Q (By Mr. Cowen) If all four of 'em had told you, "I don't want anything to do with this," then what would you have done?
 
 
 110
 A We would have set there on anchor 'til the boat rusted out, I suppose. It takes a crew to operate a boat, Mr. Cowen.
 
 
 111
 It takes at least two members plus the captain merely to operate the Cowboy while cruising and not fishing. The vessel was operated most of the time on automatic pilot. DeWeese made all changes in course. Throughout the voyage the crew performed their usual duties. Some helped put out the anchor, or weigh anchor, at the various places where the Cowboy went. When the Cowboy was anchored at Serrano Banks, Millis notified DeWeese that someone was on the radio. DeWeese and the crewmembers worked, slept and ate in close proximity to each other on the Cowboy. The defendants' sleeping quarters were immediately adjacent to those of DeWeese. DeWeese would usually sleep four to six hours per day. He had no weapon on the vessel.
 
 TUTTLE, Circuit Judge, concurring specially:
 
 112
 I concur in the result only. Like Chief Judge Godbold, I do so only because I am unable to distinguish this case from DeWeese as to the existence of the three factors found there to be sufficient to take such a case to the jury. We are, of course, bound by the DeWeese case as a binding precedent. It can be overruled only by an en banc decision of this Court.
 
 
 113
 Along the lines suggested by Chief Judge Godbold, I present a hypothetical case which I believe most Judges of this Court would say should not go to a jury. Suppose a shrimping boat captain enlisted from the docks of Tarpon Springs a young non-English speaking youth to go with him on a shrimping trip for 10 days; the crewman inspects the vessel and finds it fully equipped for the purpose, with nets, refrigeration, stores, etc. and he signs on. The vessel departs and unknown to the crewman it ends up at the Rosario Banks where it is loaded, without any help by him, with several tons of marijuana. The seaman now has no choice but to continue his crewman's duties, jump overboard or mutiny against a captain and crew of four older men, all of whom may be armed; his sleeping quarters are of necessity close to the others as are his other relations.
 
 
 114
 Such a crewman would have to choose to take the stand and testify to these facts and depend upon the jury to acquit him, or stand helpless once the government had made its proof of length of voyage, quantity of marijuana and closeness of relationship. By specifying the three "factors from which the jury could reasonably find guilt beyond a reasonable doubt" this Court has placed almost an absolute burden upon a defendant to take the stand to prove the innocence of his presence on the boat.
 
 
 115
 It may be said that this is an extreme case, but from the record before us, it is not farfetched as compared with the facts dealing with the predicament of some of these appellants when they discovered that without any participation on their part, the captain had made his firm decision to engage in the marijuana hauling business.
 
 
 116
 Thus, I, too, express the belief that the Court should take this case en banc to review the decision in DeWeese and possibly clarify Alfrey.
 
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452 October 14, 1980
 
 
 [1]
 In Alfrey the court also noted that the appellants had sailed as crew members from Colombia in a marijuana laden vessel and that their vessel engaged in "highly suspicious" maneuvers on the night of its capture. United States v. Alfrey, 620 F.2d 551, 555 (5th Cir. 1980). Close analysis shows that these factors are not essential to the court's finding of a conspiracy to import. Presumably, both factors are important because they are circumstantial evidence that the crew was aware that marijuana was aboard the vessel. However, this conclusion can be inferred solely from the three aforementioned Alfrey-DeWeese factors. Thus, the factors described on page 555 of the Alfrey opinion simply serve to buttress the conclusion on page 556. Furthermore, analogous factors exist in this case. For example, in Alfrey the vessel maneuvered suspiciously; here it is highly suspicious that after a ten day voyage there was absolutely no evidence that the COWBOY, a shrimping vessel, had been shrimping. At any rate, it is clear that all aboard the vessel knew that it was loaded with contraband
 My most distinguished colleagues, who concur specially, view DeWeese and Alfrey as improperly decided, but binding. It is submitted, however, that their apprehensions may not be well founded. Our holding here is not that circumstantial evidence mandates a conviction. The evidence is sufficient to authorize the jury to find guilt. Mere presence at the scene of criminal activity is not, alone, sufficient. Yet it is material, highly probative, and not to be discounted. That one confronting most persuasive circumstantial evidence against him might well find it prudent to rebut it is no new concept derived from DeWeese or Alfrey. Neither the law nor the court can compel a defendant to testify, but defense counsel well know that evidence in a particular case may make it prudent that he do so. The defendant's choice to testify, present evidence, or remain silent and rest is constitutionally protected. The constitution does not prohibit conviction merely because the only hope of avoiding it may be the defendant's testimony.
 
 
 [1]
 There were such charts in this case but no evidence connects any of the defendants with them by fingerprints, markings or by use of them in usual duties