[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 21, 2006
THOMAS K. KAHN
CLERK

_____

No. 04-15727

_____

D. C. Docket No. 03-20765-CR-UUB

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MEHRZAD ARBANE,
a.k.a. Tony,
a.k.a. El Turco,
a.k.a. Achi Saba,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(April 21, 2006)**

Before BARKETT and WILSON, Circuit Judges, and CONWAY[*], District Judge.

_____

[*]Honorable Anne C. Conway, United States District Judge for the Middle District of
Florida, sitting by designation.

BARKETT, Circuit Judge:

Mehrzah Arbane appeals his conviction, following a jury trial, for conspiracy to import five kilograms or more of cocaine into the United States in violation of 21 U.S.C. §§ 952(a), 960(b)(1)(B), and 963.  On appeal, Arbane argues that: (1) we lack jurisdiction to try, imprison, and punish him because his presence in the United States was procured in violation of the extradition treaty between the United States and Ecuador; (2) the trial court erred in admitting evidence of prior unrelated crimes involving alien smuggling and false documents while excluding evidence of Arbane's acquittal in an Ecuadorian criminal tribunal for possession of the drugs in question in this case; (3) the trial court erred in denying Arbane's motion for mistrial based on testimony highlighting Arbane's invocation of his right to remain silent in the context of the Ecuadorian criminal proceedings;  (4) the evidence was insufficient to support the conviction; and (5) the trial court erred in imposing a 235-month sentence in violation of United States v. Booker, 543 U.S. 220 (2005), and Blakely v. Washington, 542 U.S. 296 (2004). We conclude that the evidence admitted at trial was insufficient to support his conviction for conspiracy to import cocaine into the United States, thus we address only Arbane's arguments on jurisdiction and sufficiency of the evidence.

## I. BACKGROUND

2

Arbane was indicted on one count of conspiracy to import five kilograms or more of cocaine. The indictment alleged that Arbane was guilty of a conspiracy to import cocaine into the United States which commenced in October 2001 and ended on January 8, 2002. During Arbane's trial, the government's key witness was Jose Jairo Velez, a government informant who testified that he and Arbane had engaged in various criminal activities, including the exportation of cocaine from Ecuador. Arbane was convicted and sentenced to 235-months' imprisonment, a five-year term of supervised release, a $100 special assessment, and a $5,000 fine. He now brings this timely appeal.

## II. DISCUSSION

### A. Jurisdiction

Arbane first challenges whether there was jurisdiction to try him in the Southern District of Florida because of the manner in which his presence in the United States was obtained. After Arbane was acquitted on drug possession charges brought in Ecuador, he was ordered deported to Iran. En route to Iran, Arbane's plane landed for a stopover in Houston, Texas, where Arbane was arrested on the instant indictment and removed to the Southern District of Florida. Arbane argues that because he arrived in the United States outside of the normal judicial and treaty processes, the court lacked jurisdiction to try, convict, and

3

imprison him.

We conclude that the Supreme Court's decision in <u>United States v. Alvarez-Machain</u>, 504 U.S. 655 (1992), precludes relief on this basis. In <u>Alvarez-Machain</u>, the Court held that unless an extradition treaty contains an explicit provision making the treaty the exclusive means by which a defendant's presence may be secured, extra-treaty seizures are permitted. <u>Id.</u> at 664. Alvarez-Machain was forcibly abducted from Mexico at the behest of the DEA to stand trial in the United States. The Court dismissed Alvarez-Machain's claim because our treaty with Mexico did not expressly forbid abductions to secure a defendant's presence. <u>Id.</u> Whereas the defendant in <u>Alvarez-Machain</u> was abducted by law enforcement agents, Arbane was simply placed, by Ecuadorian officials, on a plane that stopped in the United States. Arbane does not and cannot claim that our extradition treaty with Ecuador contains a clause expressly requiring that we secure his presence in accordance with the treaty.

Arbane likewise cannot point to a law which divests us of jurisdiction under these circumstances. "[T]he power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.'" <u>Frisbie v. Collins</u>, 342 U.S. 519, 522 (1952) (citing <u>Ker v. Illinois</u>, 119 U.S. 436, 444 (1886)). The Supreme Court's

4

Ker-Frisbie doctrine holds that a criminal defendant cannot defeat personal jurisdiction by asserting the illegality of the procurement of his presence in the relevant jurisdiction — here, the United States. See, e.g., United States v. Noriega, 117 F.3d 1206, 1214 (11th Cir. 1997). Thus, Arbane is not entitled to dismissal for lack of jurisdiction.

B.    Sufficiency of the Evidence[1]

Arbane argues that the government's evidence is insufficient to support his conspiracy conviction because the government failed to prove that he conspired with anyone other than a government informant, which is insufficient to support a conviction for conspiracy and requires reversal.[2]

The evidence of the charged conspiracy in this case was presented only through the testimony of confidential informant Jose Jairo Velez.[3] Velez testified

---

[1]We review de novo the sufficiency of evidence to support convictions. United States v. Pineiro, 389 F.3d 1359, 1367 (11th Cir. 2004). We resolve all reasonable inferences in favor of the jury's verdict. Id. "The evidence is sufficient so long as a reasonable trier of fact, choosing among reasonable interpretations of the evidence, could find guilt beyond a reasonable doubt." Id.

[2]Arbane also argues that there was insufficient evidence of his intent to import drugs to the United States. Because we conclude that there was insufficient evidence of a culpable co-conspirator, we need not address Arbane's other arguments concerning sufficiency of the evidence.

[3] The government presented the testimony of an Ecuadorian police officer who seized 222 packages from an apartment in Guayaquil, Ecuador that Jose Lopez-Posada was renting from Arbane. An Ecuadorian forensic chemist testified that the substance seized was cocaine. Neither of these witnesses testified as to a conspiracy or agreement involving Arbane.

The government also offered the videotaped deposition of Jose Lopez-Posada. However,

5

that he and Arbane met in 1999 and began engaging in various illegal conduct throughout Central America, South America, and Mexico.  Eventually, they engaged in the drug trade.  He and Arbane shipped drugs from Ecuador to Mexico, from Mexico to Guatemala, from Guatemala to Panama, and from Panama to Ecuador.  These transactions began in 1999 and ended in December 2000.

In early 2000, Velez and Arbane purchased and shipped cocaine from Ecuador to Mexico, where they sold fifteen kilograms to Jose Luis Jimenez, known as the Engineer.  Just before Easter in 2000, the Engineer transported the fifteen kilograms to New York, where they were sold.  Velez testified that in the summer of 2000, Velez showed two men how to vacuum seal the drugs so they could fit on the Engineer's airplane.  He testified that one of these men "had sort of a swarthy or darkish skin" and the other "had perhaps Indian features" and "was called Jose."

According to Velez, the Engineer bought ten more kilograms of cocaine from him and Arbane in early December 2000 and an additional amount in late December 2000, both of which he imported to the United States.  This was the

---

Lopez-Posada testified that he was a farmer from Colombia who was paid $1,000 per month to reside in the apartment in Guayaquil, Ecuador where the cocaine was found.  He stated that he used $300 to pay the rent and used the remaining money for expenses.  He denied any involvement in drug transactions.
     Arbane did not testify on his own behalf.

final instance when they sold drugs to the Engineer.[4]

Velez testified that towards the end of 2000, Arbane discussed with Velez the possibility of storing drugs for shipment to Mexico or possibly Miami in containers of frozen seafood:

> [Arbane] had attempted to speak with a nautical shipping company, and I spoke with another nautical shipping company in Mexico City, so there were two possibilities of bringing the drugs over: One was bringing it among a load of frozen vegetables into the port of Mazatlan, Mexico, and another one was on a ship in a load of seafood and fish coming into the city of Miami.
>
> In one of my trips into Ecuador in the year 2000, [Arbane] took me to show me a storage place for containers, which was a hidden compartment this container had, a frozen container, next to the

---

[4] This evidence pertaining to the prior importation of drugs into the United States was admitted pursuant to Federal Rule of Evidence 404(b). The district court correctly instructed the jury, without objection from the government, that it was not permitted to consider evidence of Arbane's prior acts similar to those charged in the indictment but committed on other occasions except for the purpose of determining Arbane's intent, and only if they found beyond a reasonable doubt from other evidence in the case that Arbane did commit the acts charged in the indictment. We agree with the district court that the evidence of Arbane's prior drug dealing was properly admitted as probative of intent. See Calderon, 127 F.3d at 1332. We also agree with the district court that evidence of prior bad acts without evidence that Arbane committed the acts charged in the indictment is insufficient to sustain a conviction.

The evidence of a prior conspiracy to import drugs throughout South America and even to import drugs into the United States from 1999 through 2000 with the assistance of the Engineer cannot support the conspiracy actually charged. The government presented all evidence regarding the Engineer as 404(b) evidence precisely because it predated the period of illegal activity alleged in the indictment. The notice requirement within Rule 404(b) as well as the fact that Rule 404(b) expressly bars evidence of prior bad acts from being used to suggest action in conformity therewith makes clear that 404(b) evidence cannot, by itself, serve as a basis for a conviction. See United States v. Terrell, No. 04-12882, 139 Fed.Appx. 208 (11th Cir. 2005) (approving jury instruction that prior conviction alone could not be basis to determine guilt for charged offense).

refrigeration unit, and it was there we were gonna store, put the drugs in that we were gonna bring to Miami. And in that instance <u>only Tony and I would be the only people involved</u>.

Despite the discussion regarding the possibility of importing drugs to the United States by boat, Velez testified that they did not do so at the time:

> Q: So, between October 2001 and January of 2002,[5] you and [Arbane] never had an agreement during that time frame to bring drugs into the United States, did you?
> A: No to the United States and not to anywhere else, because we couldn't.

In June 2001, the Engineer was arrested and detained in the United States.

Velez testified that the Engineer was the only conduit they used to bring drugs to the United States by plane:

> Q: So the only connection you had to bring drugs into New York was the Engineer, correct?
> A: Yes, sir.
> . . .
> Q: Other than the Engineer, there was nobody else to take it to the United States. Am I correct?
> A: There were more people, but we didn't work with anyone else but the Engineer.

Just after the Engineer was arrested, Velez began cooperating with the government as an informant and then began taping conversations between himself

---

[5] October 2001 through January 2002 were the dates of the conspiracy charged in the indictment.

and Arbane.[6]  At trial, the government introduced these recorded conversations. Velez testified that during these conversations, Arbane complained that it was costing him a lot of money to pay Lopez-Posada for the storage of the drugs in Ecuador.  He also explained that during one of these conversations, he and Arbane were discussing the possibility of importing drugs to the United States via boat. Velez explained that although he told Arbane during the conversation that there was a third party who would receive the drugs once the ship arrived at its final destination and who would receive 30% of their profits, in reality the plan was for U.S. Customs to receive the ship and unload the drugs upon the ship's arrival.

The question before us is whether Velez's testimony suffices to support a conviction for the charged conspiracy to import cocaine into the United States.  To support such a conviction, the government must prove beyond a reasonable doubt that there existed an agreement between two or more persons to import narcotics into the United States and that the defendant knowingly and voluntarily participated in that agreement.  United States v. Obregon, 893 F.2d 1307, 1311 (11th Cir. 1990).

---

[6]In the spring of 2000, Velez and his wife had attempted to buy a false visa from an undercover agent.  Velez left the United States and waited for his wife's legal problems to clear up.  His wife was subsequently arrested, and both he and his wife were charged.  Velez then returned to the United States in the summer of 2001 and became a government informant.

It is axiomatic that you cannot have a conspiracy without an agreement between two or more culpable conspirators. See United States v. Kelly, 888 F.2d 732 (11th Cir. 1989). If there are only two members of a conspiracy, neither may be a government agent or informant who aims to frustrate the conspiracy. See United States v. Wright, 63 F.3d 1067, 1072 (11th Cir. 1995). The government may prove the existence of an agreement by circumstantial evidence through "inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." Obregon, 893 F.2d at 1311 (quoting United States v. Tamargo, 672 F.2d 887, 889 (11th Cir. 1982)).

In this case, we do not find sufficient evidence of the relevant agreement between Arbane and anyone other than Velez, a government informant, during the relevant time period. The government concedes that Velez cannot be a co-conspirator because he was a government informant. The government likewise concedes that the Engineer was not a member of the conspiracy charged in the indictment because there is no evidence that he had a continuing role or interest in a relationship with Arbane and Velez after he was arrested and detained in June 2001.

The government asserts the existence of three possible co-conspirators — (1) Jose Lopez-Posada, the man renting the house where the drugs were found, (2)

10

Luis Castillo Amen, Arbane's secretary in Ecuador, and (3) "Rene,"[7] one of

Velez's contacts who could allegedly transport the drugs out of Mexico.[8]  Having

reviewed the evidence presented at trial, we conclude that the government failed to

prove the existence of a co-conspirator to import drugs into the United States other

than Velez.

With reference to Jose Lopez-Posado, the government presented evidence

that he was arrested with Arbane in Ecuador and that he took care of the apartment

in Ecuador where the drugs were kept.  Specifically, Velez testified that Jose

Lopez-Posado was "the gentleman who took care of or who guarded the house

_____

[7]The government did not argue in its brief that "Rene" was a member of the conspiracy and raised that possibility for the first time at oral argument.

[8]The indictment alleged that Arbane conspired with "other persons both known and unknown," but did not name any co-conspirators.  While it is the law of this Circuit that "an individual can be convicted of conspiracy with 'unknown persons' referred to in the indictment," United States v. Figueroa, 720 F.2d 1239, 1244-45, 1245 n. 8 (11th Cir. 1983), the government has not proven the existence of unknown persons and has only proffered the three named possible co-conspirators discussed herein.  While in its brief, the government argues that Arbane "was paying a lot of money" to safeguard the cocaine, the evidence at trial revealed only that Lopez-Posada was paid to guard the house where the cocaine was found and did not reveal the existence of any other persons, known or unknown, who were responsible for anything relating to drugs.  Furthermore, the government did not argue either in its briefs or at oral argument that there were unnamed co-conspirators -- they only argued that Arbane conspired with Lopez-Posado and Luis Castillo Amen, and at oral argument, Rene.  Accordingly, the government has waived any arguments pertaining to additional co-conspirators.  See Marek v. Singletary, 62 F.3d 1295, 1298 n.2 (11th Cir.1995) ("Issues not clearly raised in the briefs are considered abandoned.").  In any event, we have reviewed the entire record and fail to find any other conspirator to import drugs into the United States.

11

where the drugs were kept."[9]  However, the government presented no evidence that Lopez-Posado was a participant in, or had knowledge of, a conspiracy to import drugs into the United States.

Even if one were to infer that Lopez-Posado knew that the house he was guarding contained drugs, there is no evidence that Lopez-Posado possessed "a general understanding of the unlawful purpose of the plan," United States v. Miranda, 425 F.3d 953, 958 (11th Cir. 2005), nor "knowledge that h[is] actions would further the venture," United States v. Pedrick, 181 F.3d 1264, 1272 (11th Cir. 1999).  There was simply no evidence introduced at trial from which the jury could have found beyond a reasonable doubt that Lopez-Posada knew or intended or agreed in any way to import drugs to the United States.  Accordingly, the government did not meet its burden to show an agreement between two or more culpable co-conspirators to commit the illegal act charged.

The crux of the agreement element in a conspiracy case is that the government must prove a "meeting of the minds" to achieve the unlawful result.

_____

[9] In addition to the testimony of Velez, the government presented at trial the testimony of an Ecuadorian police officer, who testified that on January 8, 2002, the National Police of Ecuador searched the apartment where Jose Lopez-Posada lived and discovered 222 packages containing a total of 261 kilograms of cocaine.  Both Lopez-Posada and Arbane were detained that day.  Arbane later gave a statement to Ecuadorian prosecutors.  Arbane stated that he sublet the apartment to Lopez-Posada under an oral agreement and denied any involvement with drugs or drug trafficking.

United States v. Adkinson, 158 F.3d 1147, 1154 (11th Cir. 1998); see also United

States v. Chandler, 388 F.3d 796, 806 (11th Cir. 2004) (stating that "[t]he

government must . . . show circumstances from which a jury could infer beyond a

reasonable doubt that there was a 'meeting of the minds'" to commit the unlawful

act charged). While it is true that the government need not prove that a

conspirator knew all of the details or participated in every aspect of the conspiracy,

it was the government's burden to prove the "essential element" of "an *agreement*

between two or more persons to violate [United States] narcotics laws." United

States v. Fernandez, 797 F.2d 943, 948-49 (11th Cir. 1986); see also Miranda, 425

F.3d at 959 (noting that each conspirator "knew the essential nature of the

conspiracy") (quoting United States v. Garcia, 405 F.3d 1260, 1269 (11th Cir.

2005)).

The only conspiracy charged in this case was a conspiracy to import drugs

into the United States. The venture or plan to which two culpable co-conspirators

must have agreed is thus the importation of drugs into the United States. See

United States v. Badolato, 701 F.2d 915, 919-20 (11th Cir. 1983), rehearing

denied, 708 F.2d 734 ("The most basic element of such a conspiracy is an

agreement between two or more persons to violate federal narcotic laws."). Of

course, conspiracy to possess drugs in Ecuador, to export drugs from Ecuador, or

13

to distribute drugs in South America are not crimes in the United States.[10]  The

government was therefore obligated to prove that two co-conspirators agreed to a

United States crime – to be precise, the crime charged in the indictment.[11]

The requirement that the government prove an agreement to the basic

conspiracy is not a new one.  The government has universally been held to the

burden of showing that at least two persons have agreed to the basic object of the

conspiracy.  See United States v. Frick, 588 F.2d 531, 535 (5th Cir. 1979) ("The

government must show that each member participated in the conspiracy with

knowledge of its illegal purpose and not merely that a member associated with a

bad person." (emphasis added)); United States v. Davis, 183 F.3d 231, 244 (3d Cir.

---

[10] The dissent suggests that this opinion "seems to read a new essential element into the offense of conspiracy-to-import: knowledge on the art of an unindicted co-conspirator as to the intended destination of the drugs."  This is simply not the case.  The reason that the destination of the drugs is significant here is because the agreement to import is the essence of the charged conspiracy.  In fact, the only reason we have subject-matter jurisdiction in this case is the laws of the United States are alleged to have been violated.  In a conspiracy to import drugs into the United States, the essential nature of the conspiracy is the importation of narcotics into the United States.  Such a conspiracy requires the agreement of two or more people to violate the laws of the United States.  The co-conspirator need not know every fact about the conspiracy – for example, he need not know the details of when the drugs will be imported into the United States or who else is involved in the importation, but he must at the very least know that the drugs will be imported into the United States.

This is, of course, not meant to suggest that in every drug prosecution the government need prove an agreement about the intended destination of drug shipments, for example, in cases involving actions which take place wholly within the borders of the United States. However, the gravamen of a drug importation crime, which permits the case to be brought in U.S. courts, is the importation into the United States.

[11]For these reasons, I fully agree with Judge Conway's special concurrence.

14

1999), opinion amended, 197 F.3d 662 (3d Cir. 1999) ("[A] person cannot conspire with himself; <u>at least two conspirators must have sufficient knowledge</u> in order for there to be a conspiracy." (emphasis added)); <u>United States v. Hendrickson</u>, 26 F.3d 321, 333 (2d Cir. 1994) ("[I]t is axiomatic that no conspiratorial agreement exists unless at least <u>two culpable co-conspirators agree</u>, and consequently, the defendant's agreement must be with someone other than a government agent or informant." (emphasis added)).[12]

As the Supreme Court has stated, "It is impossible in the nature of things for a man to conspire with himself. . . . [C]onspiracy imports a corrupt agreement between <u>not less than two with guilty knowledge</u> on the part of each." <u>Morrison v. California</u>, 291 U.S. 82, 92 (1934) (emphasis added and citations omitted). The Supreme Court's analysis of the facts in <u>Morrison</u> is particularly apt. Two men, George Morrison and H. Doi, were convicted of conspiracy to violate California's

---

[12]The dissent seems to be bifurcating the agreement and knowledge elements, arguing that there can be an agreement between two persons even if one does not have any knowledge of the basic purpose of the agreement. <u>See</u> Dissenting Opinion at n.1. The dissent cites numerous cases in which we have discussed the government's need to prove the *defendant's* requisite knowledge, but of course none of those cases are exclusive of the government's obligation to prove an agreement between the defendant and at least one other co-conspirator. In fact, it is impossible to have an agreement absent knowledge by both parties as to what it is they have agreed to accomplish. There exists no scenario where a person will have agreed to a conspiracy without knowledge of the essential nature of the conspiracy – the very definition of an "agreement" is a meeting of the minds, and there can be no meeting of the minds if only one mind contains knowledge of the object of the agreement.

15

Alien Land Law. That statute made it a crime to knowingly conspire to place an alien Japanese, ineligible for citizenship, in the possession and enjoyment of agricultural land within the state. Because Morrison did not have knowledge that Doi was ineligible for citizenship, the Court reversed each's conviction since "[i]n California as elsewhere conspiracy imports a corrupt agreement between not less than two with guilty knowledge on the part of each." 291 U.S. at 92. The Court concluded that "Doi was not a conspirator, however guilty his own state of mind, unless Morrison had shared in the guilty knowledge and design." Id. at 93; see also 15A C.J.S. Conspiracy § 111 (2005) ("When knowledge is an essential element of the underlying substantive offense, all co-conspirators must possess the requisite knowledge, as a person cannot conspire with himself or herself, and at least two conspirators must have sufficient knowledge in order for there to be a conspiracy." (emphasis added)); United States v. Brazel, 102 F.3d 1120, 1139-40 (11th Cir. 1997) (affirming jury instruction that "a person who has no knowledge of a conspiracy, but who happens to act in a way which advances some purpose of one, does not thereby become a conspirator").

In this case, the record is devoid of any evidence that Lopez-Posado knew of the existence of a plan to import the drugs into the United States, much less its purpose or his role in furtherance thereof. For instance, the recorded conversations

16

between Velez and Arbane reveal an agreement between the two men to import drugs, but the only involvement of Lopez-Posada anywhere in these conversations is Arbane's mention that Lopez-Posada was guarding the house where the drugs were stored. Neither the conversations themselves, nor Velez's explanation of them during his testimony at trial, reveal an agreement by Lopez-Posada to import drugs into the United States. The fact that Lopez-Posada rented and guarded the house from Arbane does not support an agreement on Lopez-Posado's part to belong to a conspiracy to import drugs into the United States. Even if we could infer that Lopez-Posada knew that the drugs were leaving Ecuador, there was no evidence that Lopez-Posada knew they were headed to the United States.[13] We

_____

[13]As noted in footnote 10, the essential element of the charged conspiracy to which two or more persons must have agreed was importation of narcotics into the United States. Even if it could be inferred that Lopez-Posada was the man "called Jose" with "Indian features" who Velez taught to vacuum seal drugs to fit on the Engineer's airplane in 2000, this is at best evidence that in 2000, Lopez-Posada knew that Arbane and Velez intended to *export* drugs from Ecuador on the Engineer's airplane. There was absolutely no evidence that the man "called Jose" knew where the airplane was headed. The facts that the drugs were vacuum packed, sealed with tape, and covered in an oily substance to mask the smell are likewise evidence that Lopez-Posada may have known the drugs would be exported, but not that he knew they were headed to the United States.

Moreover, even if there was evidence that Lopez-Posada was part of the conspiracy to import drugs to the United States with the Engineer, that conspiracy occurred prior to the period of conspiracy alleged in the indictment, and there was no evidence that Lopez-Posada knew of or was part of the charged conspiracy to import drugs to the United States by boat from October 2001 to January 2002. See Fernandez, 797 F.2d at 949 (holding that past involvement in drug activity does not qualify as evidence of an agreement to import). As we have stated, the evidence regarding the Engineer was introduced as 404(b) evidence, which cannot be the sole basis to convict Arbane of the charged conspiracy.

17

recognize that circumstantial evidence is sufficient to prove an agreement, but the government presented no evidence - neither direct nor circumstantial - to support an agreement by Lopez-Posada to import drugs into the United States.

In that respect, this case is unlike those cases where we have found sufficient evidence to convict crew members aboard ships which were headed to the United States as knowing participants in a drug conspiracy. See, e.g., United States v. Cruz-Valdez, 773 F.2d 1541 (11th Cir. 1985) (en banc); United States v. Munoz, 16 F.3d 1116, 1124-25 (11th Cir.1994); but see United States v. Vidal-Hungria, 794 F.2d 1503 (11th Cir. 1986) (reversing convictions of seven crew members for conspiring to possess and possessing marijuana, on the ground that the circumstances of the discovery of the marijuana "does not lend itself to an inference that all persons on the vessel necessarily knew of the presence of the marijuana"). In both Cruz-Valdez and Munoz, the co-conspirators were arrested in a boat which the evidence showed was headed to the United States. Indeed, the defendants in Cruz-Valdez and Munoz never contended that the government had failed to prove their knowledge that the ship on which they were all arrested was heading to the United States. In fact, we have on least one occasion affirmed a conspiracy conviction only after analyzing whether the government met its burden of introducing sufficient evidence of an agreement to import to United States

18

specifically.  See United States v. DeWeese, 632 F.2d 1267, 1271-72 (5th Cir. 1980) (affirming conviction for conspiracy to import based on presence of navigational charts aboard the boat and expert testimony that the ship was headed to the United States and based on the close relationship between captain and crew during the long voyage).

None of the evidence from which we have previously inferred knowing participation in a conspiracy to import was present in this case.  Lopez-Posada was not arrested aboard a ship laden with drugs and headed to the United States.  There was simply no circumstantial evidence tying anyone other than Arbane and Velez in any way to an agreement to import drugs into the United States.  The government may have proved a conspiracy to possess drugs in Ecuador or export them from Ecuador to any number of South American countries, but that was not the conspiracy charged, nor could the United States criminalize such conduct without a jurisidictional basis.  For these reasons, we must conclude that the government did not present sufficient evidence of an agreement between Arbane and Lopez-Posada to import drugs to the United States.

Nor can the evidence support the government's alternative claim that Velez and Arbane conspired with Luis Castillo Amen, Arbane's secretary in Ecuador. The only evidence pertaining to Luis is that he functioned as Arbane's secretary,

19

for example, by keeping Velez in touch with Arbane. According to Velez, Arbane stopped sending Luis money in Ecuador, so Velez "sent him $500 so that he could work." Velez stated that he desired to send Luis out of Ecuador because he was concerned that he would talk to the authorities, though Velez did not testify as to what Luis might say to the authorities. As of December 23, 2001, neither Velez nor Arbane had a telephone number or other means of contacting Luis. This evidence is clearly insufficient to demonstrate that Luis Castillo Amen was a participant in or had knowledge of any criminal conspiracy, much less the one alleged here. We have long held that mere association with persons engaged in a conspiracy does not qualify someone as a member of the conspiracy. See, e.g., Kelly, 888 F.2d at 740. Furthermore, Velez's fear that Luis might speak with the authorities fails to establish the requisite knowledge or agreement absent testimony as to what Luis might speak about.

Finally, at oral argument, the government argued for the first time that a "Rene" could be counted as a co-conspirator with Velez and Arbane. At trial, Velez testified that someone named Rene had a connection at a port in Mazatlan, Mexico and that Rene could send drugs from Mexico to the United States. However, rather than presenting evidence that Arbane and Rene were co-conspirators, the government's evidence was to the contrary. In the transcript of

20

the December 23, 2001 conversation between Arbane and Velez, it is evident that Arbane rejected the offer of working with Rene; when Velez mentioned that he had a friend who could help bring it, ostensibly referring to the ability of Rene to assist in bringing drugs across the border, Arbane told him to "[f]orget about that." When Velez testified that Arbane showed him the storage compartments where he claimed they were planning to put drugs to be brought to Miami, he described the scheme as one in which "only Tony and I would be the only people involved."

In short the evidence is insufficient to demonstrate that anyone other than a governmental informant was involved with Arbane in an agreement to import drugs into the United States. Although there is no doubt that Arbane had been involved in illegal conduct elsewhere, it was the government's burden to prove, beyond all reasonable doubt, that there existed a specific agreement between the defendant and at least one or more culpable co-conspirators to import narcotics into the United States. The government failed to meet this burden. Accordingly, Arbane's conviction must be reversed.

**REVERSED**.

21

CONWAY, District Judge, concurring specially:.

I concur in the result. There is sufficient circumstantial evidence that Arbane agreed with Velez (the confidential informant) to import cocaine into the United States from Ecuador. There is also sufficient circumstantial evidence that other persons identified by the Government in its brief were participants in the conspiracy to import drugs out of Ecuador. There is no evidence that any of the other unindicted co-conspirators knew that the drugs were to be imported into the United States. In order to have a conspiracy to import drugs into the United States at least one person, other than the confidential informant, had to agree with Arbane to that essential element of the conspiracy.

WILSON, Circuit Judge, dissenting:

I dissent because I am convinced that the evidence was sufficient to support Arbane's conviction for conspiracy to import cocaine into the United States. The opinion concludes that the evidence was insufficient to convict Arbane because the government failed to prove that Arbane conspired with anyone other than the government informant Velez. I disagree. I think that there was sufficient evidence from which a reasonable jury could find that Arbane conspired with Jose Lopez-Posada, the man who guarded the drugs, to import cocaine into the United States during the indictment period.

"To prove participation in a conspiracy, the government must have proven beyond a reasonable doubt, even if only by circumstantial evidence, that a conspiracy existed and that the defendant knowingly and voluntarily joined the conspiracy." *United States v. Garcia*, 405 F.3d 1260, 1269 (11th Cir. 2005) (per curiam). To meet this burden, "the government need not prove that the defendant[] knew all of the detail[s] or participated in every aspect of the conspiracy. Rather, the government must only prove that the defendant[] knew the essential nature of the conspiracy." *Id.* at 1269-70 (citation and quotations omitted). The government may prove the existence of a conspiracy by "direct or circumstantial evidence, including inferences from the conduct of the alleged participants or from

23

circumstantial evidence of a scheme." *Id.* at 1270 (citation and quotations omitted). "Indeed, because the crime of conspiracy is predominantly mental in composition, it is frequently necessary to resort to circumstantial evidence to prove its elements." *Id.* (citation and quotations omitted).

The opinion concludes that the record is devoid of any evidence that Lopez-Posada knew of the existence of a plan to import the drugs into the United States, and that even if one were to infer that Lopez-Posada knew that the apartment he was guarding contained drugs that were leaving Ecuador, there is no evidence that Lopez-Posada possessed "a general understanding of the unlawful purpose of the plan," *United States v. Miranda*, 425 F.3d 953, 958 (11th Cir. 2005), i.e., that the drugs were to be imported to the United States.[14] The opinion writes that the only

_____

[14]Judge Barkett's opinion seems to read a new essential element into the offense of conspiracy-to-import: knowledge on the part of an unindicted co-conspirator as to the intended destination of the drugs. Such a reading places an enhanced burden on the government that is not supported by our precedent, which speaks in terms of the *defendant's* knowledge, not the knowledge of an unindicted co-conspirator such as Lopez-Posada. *See Garcia,* 405 F.3d at 1270 ("[T]he government must only prove that the *defendant[]* knew the essential nature of the conspiracy.") (citation and quotations omitted) (emphasis added); *United States v. Pedrick*, 181 F.3d 1264, 1272 (11th Cir. 1999) ("[T]he evidence need not show that each *defendant* knew of each phase of the conspiracy, all of its details, all of the conspirators, or the participants in each event.") (emphasis added); *United States v. Brazel*, 102 F.3d 1120, 1131-32 (11th Cir. 1997) ("A *defendant* may be culpable even if he . . . played a minor role in the conspiracy, since a conspirator need not know the details of each act making up the conspiracy.") (emphasis added); *United States v. Pantoja-Soto*, 739 F.2d 1520, 1525 (11th Cir. 1984) ("[T]he government must demonstrate . . . that the *accused* had knowledge of at least the essential objective of th[e] agreement . . . .") (emphasis added); *United States v. Pintado*, 715 F.2d 1501, 1503 (11th Cir.

24

evidence concerning Lopez-Posada was that he was arrested with Arbane and that he was paid to guard the house where the drugs were found. The record does not support the opinion's conclusion or its characterization of the evidence. The opinion entirely disregarded our long-standing precedent with regard to our standard of review. We *must* review the evidence in the light most favorable to the government and draw all reasonable factual inferences in favor of the jury's

---

1983) (per curiam) ("To be guilty of a conspiracy a *defendant* need not have knowledge of every detail of the conspiracy. Knowledge of the primary objective of the conspiracy will suffice.") (emphasis added). In fact, the opinion does not cite to a single conspiracy-to-import case, from any circuit, in which the government was required to prove that an unindicted co-conspirator knew that the drugs were headed for the United States in order to establish the defendant's guilt.

Evidence of an unindicted co-conspirator's particular knowledge as to the object of the alleged conspiracy (here the importation of drugs into the United States) is certainly relevant to establishing the existence of a conspiratorial agreement, but it is the *agreement*–not the unindicted co-conspirator's particular knowledge–that is the essential element to be proved. Because a conspiratorial agreement can be established by circumstantial evidence, one can conceive of numerous plausible scenarios in which the existence of a conspiracy to import drugs into the United States can be inferred without any specific showing as to an unindicted co-conspirator's knowledge of its object. The question then becomes whether the *defendant* knew the essential nature of the conspiracy and joined it voluntarily–and even this can be proven by circumstantial evidence. *See United States v. Gonzalez*, 810 F.2d 1538, 1542-43 (11th Cir. 1987) (per curiam); *United States v. DeWeese*, 632 F.2d 1267, 1271-72 (5th Cir. 1980). For example, in *DeWeese*, the defendant's intention to import drugs into the United States was proven with only one Coast Guard Commander's testimony, which was based on inferences drawn from navigational charts discovered aboard the boat, that the boat carrying the drugs was heading toward the United States, instead of Mexico, Cuba, or the Bahamas. 632 F.2d at 1271.

In this case, the jury was not instructed that in order to convict Arbane it must find that the government proved Lopez-Posada's knowledge. Rather, the jury was instructed properly that in order to convict Arbane it must find "[t]hat two or more persons . . . came to a mutual understanding to try to accomplish a common and unlawful plan," "[t]hat the *Defendant*, knowing of the unlawful purpose of the plan, willfully joined in it; and [t]hat the object of the unlawful plan was to import . . . cocaine into the United States . . . ." (emphasis added).

25

verdict. *Glasser v. United States,* 315 U.S. 60, 80, 62 S. Ct. 457, 469, 86 L. Ed. 680 (1942). Furthermore, "[a] reversal is in order only if the evidence, viewed in the light most favorable to the [g]overnment, is such that a reasonably minded jury *must* have a reasonable doubt as to the existence of the essential elements of the crime charged." *United States v. Kelly*, 749 F.2d 1541, 1545-46 (11th Cir. 1985) (citation and quotation omitted). The opinion completely ignored our obligation to sustain the jury's verdict if *any* reasonable construction of the evidence allowed them to find guilt beyond a reasonable doubt, *see United States v. Bell*, 678 F.2d 547, 549 (Former 5th Cir. Unit B 1982), and instead re-weighed the evidence in the light most favorable to the defendant. "It is not for us to weigh the evidence or to determine the credibility of the witnesses." *Glasser*, 315 U.S. at 80.

The evidence viewed in the light most favorable to the government established facts from which the jury could reasonably infer that Arbane knowingly and voluntarily conspired with Lopez-Posada to import cocaine. The government presented substantial evidence to support its theory that Arbane paid Lopez-Posada to guard the cocaine, which was vacuum-sealed, wrapped in small packages and stored in an apartment in Guayaquil, Ecuador, until it was time for the drugs to be shipped by plane (and later, by boat) to the United States. For

26

example, the government offered Lopez-Posada's videotaped deposition and the trial testimony of Velez and an Ecuadorian police officer to prove Lopez-Posada's knowledge of the cocaine he was guarding and his participation in the conspiracy to import. Lopez-Posada testified that he was a farmer from Colombia who left behind his family to live in a two bedroom apartment in Guayaquil for approximately ten months. During that time, he was paid $1,000 monthly to stay in the apartment. He used $300 to pay the rent, and the remaining money was for his expenses. He testified that he did nothing in the apartment but wait to be taken to a farm where he could work. On January 6, 2002, Arbane arrived at the apartment with a plastic bag, a typewriter, and another bag, which Lopez-Posada stored for Arbane at the apartment. That day, Lopez-Posada also changed the apartment locks. Two days later, on January 8, Arbane returned to the apartment, and he and Lopez-Posada were arrested there with 261 kilograms of cocaine, wrapped in 222 packages. The Ecuadorian police officer testified that the packages were sealed with silver wrapping tape and covered with an oily substance that had a strong, spicy odor. The packages were found in the bedroom closets. The police also discovered in the apartment a roll of silver packaging tape and two machines used for vacuum sealing. Velez testified that the vacuum machines were

27

used to "vacuum pack," or compress, the drugs so that they could fit into the Engineer's plane's hidden compartment, which could only fit approximately 200 kilograms of drugs. Velez further testified that he showed "Jose" (presumably, Lopez-Posada) how to use the vacuum sealing machines to compress the drugs so that the packages were small enough to fit in the hidden compartment of the plane, seal the packages in silver tape, and then cover the packages with a mixture of oil, cream, pepper, and mustard.[15] This oily substance was used a repellant so that the

---

[15]The opinion writes that Velez never identified Lopez-Posada as the man called "Jose" and refuses to infer that Velez was referring to Lopez-Posada when he testified that he showed "Jose" how to vaccum-pack the drugs. To be exact, Velez testified:

> On that trip that I took to Guayaquil, [Arbane] took me to a house that had two floors. The drugs were there at that house, and two other people were guarding the drugs. One person had sort of a swarthy or darkish skin, and another person had perhaps Indian features, and he was called Jose.

> At that house I inspected all the drugs with [Arbane], Geraldo and those other two, and I asked them to do me a favor. I showed them how to manipulate this vacuum packer, and we used two types of wrapping tapes. One was first coffee color or brown, and then the other one was gray. And then we left the drugs all ready to that house.

Later, he testified:

> And [Arbane] told me we have more than 200 kilos stored in Guayaquil and we need to pay for the security for that. He told me that Jose, *the person that I had met*, was storing the drugs at a house and that he moved it to another, but it was always with security, and he told me that that entailed some expense.

(emphasis added). Next, Velez testified:

> There were two different kinds of expenses. One was to take care of the legal

28

dogs in any airport would not perceive the smell of the drugs.

Viewing this evidence in the light most favorable to the government, a reasonable jury could infer Lopez-Posada's knowing and voluntary participation in the conspiracy to import from the circumstantial evidence. A jury could reasonably conclude that Lopez-Posada knew that he was being paid to guard the cocaine and prepare it to be imported. "[A] conspirator is not required to participate in all aspects of a conspiracy and may be convicted as a co-conspirator .

---

> problems that [Arbane] had in Guayaquil, Ecuador, and then the other expenses was the person that was guarding the drugs in the house, and all the expenses that were occurred in Guayaquil.

Velez unequivocally identified Lopez-Posada in a picture and explained that Lopez-Posada was the man to whom he was referring when he testified about the expenses involved in paying "the person that was guarding the drugs in the house." Finally, Velez distinguished Lopez-Posada from the only other "Jose" mentioned regularly in this case, Jose Luis Jimenez, also known as the Engineer:

> Q: And there was mention in that phone call [during which Arbane and Velez discussed the expenses involved in guarding the drugs in Guayaquil] of a man named Jose Luis.
> A: The mention was of Luis and Jose–of Jose Luis. Luis is one person; Jose is another.
> Q: Is this [referring to the photograph picturing Lopez-Posada] the Jose that was mentioned in that telephone conversation?
> A: Yes, sir.
> Q: And who introduced you to this Jose?
> A: [Arbane] in Guayaquil, Ecuador.

In light of this testimony, to conclude that "Jose" was anyone other than Lopez-Posada would itself be an unreasonable conclusion. A reasonable jury could infer that Jose Lopez-Posada, the man who guarded the drugs, is the same "Jose" who Velez testified he showed how to pack the drugs where the drugs were being stored and guarded.

29

. . if [he] participates in some affirmative conduct designed to aid the success of the venture with knowledge that [his] actions would further the venture." *Pedrick*, 181 F.3d at 1272. Lopez-Posada offered no other explanation as to why he was being paid $1,000 monthly to do nothing in the apartment but wait. Furthermore, he denied any knowledge of the cocaine hidden in the apartment closets despite having lived there for approximately ten months. The jury was entitled to use its common sense to discredit this testimony and infer his knowledge from the testimony of Velez and the police officer. *See Garcia*, 405 F.3d at 1270 ("Because credibility determinations are the exclusive province of the fact finder, we cannot disregard the jury's credibility determination unless it is unbelievable on its face.") (citation and quotations omitted).

Furthermore, conspiracy cases in which we have found sufficient evidence to convict a crew member aboard a ship with drugs bound for the United States are analogous and instructive. In *United States v. Cruz-Valdez*, 773 F.2d 1541, 1547 (11th Cir. 1985) (en banc) (conspiracy to possess with intent to distribute), we ruled that "the government's burden to prove participation is relatively light[,]" once it has been established that the defendant was a crew member aboard a ship laden with a large quantity of drugs. We may look to circumstances such as the

30

large quantity of drugs, suspicious behavior before apprehension, inculpatory statements made after apprehension, witnessed participation as a crewman, and whether the drugs were obvious. *Id*.; s*ee also, United States v. Munoz*, 16 F.3d 1116, 1123-24 (11th Cir. 1994) (applying *Cruz-Valdez* analysis in a conspiracy to import case); *Gonzalez*, 810 F.2d at 1543 (holding that evidence that the crewmen were aboard a ship with a large quantity of drugs, that the odor was noticeable from the deck, and that a crewman became nervous upon questioning, among other evidence, was sufficient to show the crewmen's knowing and voluntary participation in the conspiracy to import). We also have found "particularly persuasive" the argument that "it is illogical to believe that one person would attempt [to import a large quantity of drugs] to the United States without pre-arranged assistance." *DeWeese*, 632 F.2d at 1272; *see also, Gonzalez*, 810 F.2d at 1543 ("Courts and juries also may take notice of the fact that drug smugglers are unlikely to employ outsiders to work a vessel carrying [a large quantity of drugs]."). Several of the factors cited in *Cruz-Valdez*, which suffice to enable a reasonable jury to find guilt beyond a reasonable doubt, are also present here. Lopez-Posada was discovered with a large quantity of cocaine in the apartment, where the drugs would have been obvious considering their strong, spicy odor. He

31

engaged in suspicious behavior including storing items for Arbane and changing the locks on the apartment. He made inculpatory statements at his deposition such as the fact that he was paid $1,000 monthly to do nothing but wait. Moreover, it is unlikely that Arbane would trust an outsider to prepare 261 kilograms of cocaine and guard it for 10 months. Though "a showing of *knowing participation* [in a conspiracy] is required[,]" "[c]ulpable participation need not be great." *Lyons*, 53 F.3d at 1201. "Guilt may exist even when the defendant plays only a minor role and does not know all the details of the conspiracy." *Id.* "The very nature of conspiracy frequently requires that the existence of an agreement be proved by inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *United States v. Ayala*, 643 F.2d 244, 248 (5th Cir. Unit A Apr. 1981).

The tape recorded conversations between Arbane and Velez, as decoded by Velez at trial, further supported the conclusion that Arbane conspired with Lopez-Posada to import cocaine into the United States. During these conversations, the two used code words to refer to the drugs. Velez explained the meaning behind their words when he testified at trial. During their December 23, 2001, conversation, Arbane stated to Velez, "Look, the truth is that I want to take out that

shit we have over there, that we have over there in Ecuador" and "I want to take that out fast." Velez explained at trial that Arbane was referring to the drugs that they had been storing in Guayaquil. Velez asked, "What are we going to do with that shit? . . . I have someone who can take it out. . . . I'll pay you if it gets lost. That's the deal." Arbane responded, "yes, okay, I'll put it in." The two discussed the details of the deal, and then Velez asked, "When are we going, when can we do it?" to which Arbane responded, "I . . . am available to do it on January 15th." Velez agreed to the date and then stated, "We have to fax him, fax him the document of the vessel and the contents of the container, what is usually done. We have to send it out to him and he'll take it out."

At trial, Velez deciphered their conversation. He explained that the drugs were to be shipped by boat from Guayaquil to Mexico and from Mexico to Miami, and then he had someone who could take the drugs off the boat when it arrived in the United States. Arbane would need to fax the shipping documents for the boat, so that he "would know what goods the boat was bringing that was coming from Guayaquil to Miami–Guayaquil to Mexico and Mexico to Miami." Velez further testified that shortly after that conversation, in January of 2002, Arbane traveled to Guayaquil to facilitate moving the drugs out of Ecuador (where they were stored

33

and guarded by Lopez-Posada) and into the United States. Two days before Arbane's arrest, on January 6, 2002, the same day that Arbane first arrived at the apartment, Velez and Arbane spoke again, this time about what percentage each would take from the sale of the drugs. Arbane asked, "You told me that he wants thirty, thirty for you and thirty for me, like that?" Velez explained at trial that Arbane wanted to know what percentage the person in the United States would receive for taking the drugs off the ship; each of them would receive one-third share.

The opinion states that these conversations reveal that shipment of drugs by boat remained only a possibility and that Arbane did not agree to the plan. It relies heavily on Velez's cross examination testimony during which he testified that Arbane did not want to import the drugs to the United States during the indictment period.[16] Although there was conflicting testimony in this case, particularly during

---

[16]However, even on cross examination Velez testified that "the goal was to bring the drug that we had in Ecuador to the United States." In response to defense counsel's question, "Did you talk on direct examination about the option of having drugs on a ship to go all the way to Miami?" Velez testified, "Yes. I explained previously . . . that there were two options: One to take the drugs to Mazatlan, and the other one from Guayaquil to Miami." He reiterated, "We had a plan since December of the year 2000[,]" when they met in Ecuador and discussed two options: "On a boat–on a vessel . . . that would make a stop in Mexico and then would go on to the United States; or another vessel that would leave directly from Guayaquil to Miami." Moreover, on redirect, he explained that once Arbane fixed his problem in Ecuador, "the agreement" was to "[g]o back and pick up the drugs and send them to Mexico and then the United States or to Miami directly." The government asked, "had the situation with the

34

the direct and cross examination of Velez, the jury is entitled to draw reasonable inferences from circumstantial evidence. "Evidence need not be inconsistent with every reasonable hypothesis except that of guilt in order to be sufficient. The jury is free to choose among reasonable constructions of the evidence." *United States v. Lyons*, 53 F.3d 1198, 1202 (11th Cir. 1995). The conversations, combined with Velez's explanation on direct examination of the plan to import the drugs to Miami and the fact that Arbane traveled to Guayaquil to facilitate the move directly after their conversation, reveals that Arbane did in fact agree to the plan and desire to import cocaine into the United States.

In sum, the evidence to support the charged conspiracy was presented through Velez's testimony that Lopez-Posada was the man who was paid to guard the drugs, that Arbane planned to import the drugs by boat to Miami, and that Arbane traveled to Guayaquil to facilitate the plan. The tape recorded conversations between Velez and Arbane during which they discussed the details

---

agreement changed on January 6th?" to which Velez reiterated, "No. [Arbane] was expecting to or waiting until he got to Guayaquil . . . to fix his personal problem and immediately get our drugs out of Ecuador." And, in response to the question "[W]hat was the status with [Arbane] and the drugs" "as of January 6th[?]," Velez responded, "[Arbane] was going to get the drugs. He was going to move them out of Ecuador. He was going to send them to Mexico, and if they couldn't be gotten into Mexico, he was going to send them to the United States."

of the importation, Lopez-Posada's videotaped deposition during which he testified that he was paid a large amount of money to live in the apartment where the drugs were seized, and testimony of the Ecuadorian police officer who found both Lopez-Posada and Arbane at the apartment with the drugs also supported the conspiracy charge. There was evidence about the amount of drugs, the careful packaging of the drugs, and the length of time that Lopez-Posada was guarding the drugs. This evidence was sufficient circumstantial evidence from which a rational jury could infer that Lopez-Posada knew of the cocaine, knew that it was headed for the United States, and assisted in this plan. The jurors had plenty of evidence on which to convict Arbane, and therefore, I would affirm.